```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF NEW MEXICO

 3
      UNITED STATES OF AMERICA,        )
 4                                     )
                      Plaintiff,       )
 5                                     )
                      vs.              )  NO: 19-CR-0137 RB
 6                                     )
      MARIO REYNOSO,                   )
 7                                     )
                      Defendant.       )
 8

 9

10                   TRANSCRIPT OF PROCEEDINGS
                        PRETRIAL CONFERENCE
11                             AND
                           JURY TRIAL
12                       VOLUME I OF II
          BEFORE THE HONORABLE ROBERT C. BRACK
13            UNITED STATES DISTRICT JUDGE
                   MONDAY, JULY 7, 2019
14                       8:35 A.M.
          LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO
15

16

17

18

19

20

21      (Proceedings reported by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE, CRR, RPR, NM CCR #259,
23                    Federal Official Court Reporter
                      100 North Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmd.uscourts.gov
```

```
 1    Appearances of Counsel:

 2         FOR THE UNITED STATES:

 3                    UNITED STATES ATTORNEY'S OFFICE
                      District of New Mexico
 4                    200 N. Church St.
                      Las Cruces, NM  88001
 5                    BY:  RENEE CAMACHO, ESQ.
                          NICHOLE HAMMOND, ESQ.
 6

 7         FOR THE DEFENDANT:

 8                    LAW OFFICE OF RUSSELL DEAN CLARK
 9                    755 S. Telshor Blvd., Ste. R202
                      Las Cruces, New Mexico 88011
10                    BY:  RUSSELL DEAN CLARK, ESQ.

11

12

13    Also Present:  Joey S. Rodriguez, HSI Case Agent

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2   <u>WITNESSES FOR THE GOVERNMENT</u>:                    <u>PAGE</u>

3   OMAR LUJAN

4       Direct Examination by Ms. Camacho            43
        Voir Dire Examination by Mr. Clark           53
5       Direct Examination cont.'d by Ms. Camacho    58
        Cross-Examination by Mr. Clark               80
6       Redirect Examination by Ms. Camacho          97

7   DANIEL ORTIZ

8       Direct Examination by Ms. Hammond           101
        Cross-Examination by Mr. Clark              110

9   JOEY S. RODRIGUEZ

10
        Direct Examination by Ms. Camacho           114
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         E X H I B I T S

2    EXHIBITS FOR THE GOVERNMENT:          IDENTIFIED    RECEIVED

3        1  Drug evidence                     108           109
         2  May 3, 2018, phone call at 8:22    59            58
4            A.M.
       2(a)  Transcript                                      58
5        3  May 3, 2018, phone call at 2:36    62            58
             P.M.
6      3(a)  Transcript                                      58
         4  May 7, 2018, phone call at 8:23    63            58
7            P.M.
       4(a)  Transcript                                      58
8        5  May 8, 2018, phone call at 12:23   64            58
             P.M.
9      5(a)  Transcript                                      58
         6  May 8, 2018, phone call at 12:55   65            58
10           P.M.
       6(a)  Transcript                                      58
11       7  May 8, 2018, phone call at 1:17    66            58
             P.M.
12     7(a)  Transcript                                      58
         8  May 8, 2018, phone call at 3:03    76            58
13           P.M.
       8(a)  Transcript                                      58
14       9  June 6, 2018, phone call at 2:35   79            58
             P.M.
15     9(a)  Transcript                                      58
        10  Text messages                      53            58
16      11  DVD from May 8, 2018              102           103
        12  Photograph                         71            71
17      13  Photograph                        106           106
        14  Photograph                        106           106
18      15  Photograph                        107           106
        16  Photograph                        107           106
19      28  Photograph                        119           119
        29  Photo lineup                      124           125
20      30  T-Mobile phone records            138           139
        31  AT&T phone records                138           139
21      32  Text messages                     131           131
        34  Title history for Ford Fusion     120           121
22      35  Photograph                         70            71
        39  January 31, 2019, phone call at   146           146
23           10:50 A.M.
      39(a)  Transcript                                     146
24      40  Not identified                                  146
      40(a)  Transcript                                     146
25

1                    E X H I B I T S continued

2    EXHIBITS FOR THE GOVERNMENT:          IDENTIFIED    RECEIVED

3        41 Not identified                                146
     41(a) Transcript                                     146
4        44 Not identified                                146
     44(a) Transcript                                     146
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In Open Court at 8:35 A.M.)

 2                        (Venire not present.)

 3              MR. CLARK:  I apologize, Your Honor.  We have a

 4      bit of an issue.  My client's pants don't fit.  It's Monday,

 5      Judge.

 6              THE COURT:  Monday of a trial.  We have a pants

 7      issue.

 8                    (Discussion off the record.)

 9              We are only changing a pair of pants; is that

10      what --

11              MR. CLARK:  He doesn't have any, Your Honor.  I

12      got a call from Joe Castro earlier this morning saying my

13      client's pants didn't fit at all.  So we've got some clothes

14      at the house that we sent down that I was trying to rummage

15      through and there's nothing.  So I was just going to send

16      somebody to Walmart, but my assistant texted me and she is

17      out today.  So the Government and I are going to try to

18      figure out how to get him some pants as quickly as possible.

19              THE COURT:  Okay.  I didn't have any idea that we

20      were hours away from pants, is what it sounds like.

21              MR. CLARK:  I think, Your Honor, maybe -- yeah,

22      Walmart is open.  I think a trip to Walmart by anybody -- if

23      I can maybe send a marshal with my credit card, but anybody

24      to get a pair of pants, and we can address the other issues.

25              MS. CAMACHO:  And to whatever extent it
```

1    facilitates, Your Honor, I can have a staff member do that.

2                THE COURT:  So he's got his jail pants on right

3    now?

4                MR. CLARK:  Right, Your Honor.  We can take care

5    of the stuff outside of the presence of the jury.

6                THE COURT:  Get him in here.  Let's go.  We'll

7    figure out the pants then later.

8                MR. CLARK:  And again, Judge, I apologize for the

9    timing.  I got the call as I was leaving the house this

10   morning.

11               MS. CAMACHO:  And I don't know, Your Honor, I

12   mean, it may be that they can't see his pants or if they --

13   maybe if the marshals drape the table the way they do, you

14   know, when somebody is shackled -- he won't be shackled, but

15   it would stop them from seeing at least until and if he

16   testifies.

17               (Whereupon the defendant entered the room.)

18               THE COURT:  *United States of America versus Mario*

19   *Reynoso*.  Mr. Reynoso is present this morning, along with

20   Mr. Clark, his counsel.  Ms. Camacho and Ms. Hammond on

21   behalf of the Government.

22               MS. CAMACHO:  Good morning.

23               THE COURT:  We're here for a jury trial this

24   morning.  We're set to begin at 9:00.  We were going to

25   cover some pretrial matters.  We are outside the presence of

1    the venire.

2         And Ms. Camacho, my concern the other day was the

3    propriety of the 851 showing up in the Indictment and

4    subsequent instructions and I just need to be brought

5    current on that.

6         MS. CAMACHO:  So Your Honor, obviously, this is

7    the new year area because the First Step Act was first

8    passed in December, at least in district, because we haven't

9    had a trial yet in which this was an issue.  But it is the

10   department's issue and my belief that, in order to comply

11   with the 851 and the statutory cite under 21 U.S.C. § 841

12   that now says that a defendant, in order to receive the

13   enhanced sentence, has to have been convicted of a serious

14   drug felony, he has to have served more than 12 months'

15   imprisonment, and he has to have been released within 15

16   years of the current offense, that those are questions that

17   have to be answered by the jury rather than by a judge.

18   Which is what we used to do, is just file the 851 notice and

19   it was just a sentencing issue.  However, because -- and

20   under *Apprendi*, I think it's still if the only question is,

21   is there a conviction, then that is something that the Court

22   can find, but when it becomes a factual issue of how long

23   did he serve in prison and when was he released from prison,

24   those are questions that we believe have to be found by a

25   jury in order to address that increased penalty.

1          So it is the direction that we've been given by

2     the department, that we need to include it in the Indictment

3     and that we have to have a jury finding as to those

4     elements, that he was convicted, that it was -- he served

5     more than 12 months, and that he was released within 15

6     years.  The defendant, I believe, could stipulate to those

7     facts, except we would still have to have a jury finding

8     that it happened, sort of like in a felon-in-possession

9     case, the defendant can stipulate that he's a felon and,

10    therefore, we don't put on the evidence detailing the

11    felony, but the jury still has to find that the defendant is

12    a felon and possessed a firearm.  The defendant can't just

13    stipulate to it and, therefore, totally avoid a jury

14    finding.

15          What I have spoken with defense counsel about,

16    and I think it's completely, at least in my view, up to the

17    defendant, and the Court, as well, is that the United States

18    would not object to a bifurcated proceeding in which we do

19    the trial, have the jury find innocence or guilt and then,

20    immediately thereafter -- it would really only be one

21    witness that we would be calling or perhaps two, but they

22    would be extremely brief, somebody to just introduce the

23    prior judgment and we have a witness from Bureau of Prisons

24    who will testify that their records show the time and length

25    of his imprisonment -- and so that the jury could then find

1   that as a bifurcated proceeding kind of like we would do it

2   with forfeiture or something, so that the jury did not hear,

3   during the guilt phase, the conviction.

4           Obviously, in this case, if the defendant

5   testifies, we've asked to be able to bring in the conviction

6   anyway as impeachment.  So from my point of view, it's up to

7   the defendant whether or not he would want to bifurcate a

8   proceeding or if he just wanted us to proceed.  But I think

9   that is something that has to be -- or should be decided at

10  the beginning now, so that if he does want to bifurcate a

11  proceeding that the jury doesn't need to be told anything

12  about that sentencing allegation until that part of the

13  proceeding happened.

14          THE COURT:  Thank you.

15          Mr. Clark?

16          MR. CLARK:  Your Honor, good morning, Judge.

17  Counsel is correct.  We both talked about this quite a few

18  times.  And I wanted to do just a little bit of research on

19  this.  I'm not finding a lot.  I've consulted other

20  attorneys.  And I think the conventional wisdom agrees with

21  the Government that under *Apprendi* and under the *Aline* case,

22  the enhancing factors, because they do increase the

23  mandatory minimum, if found, are clearly questions for the

24  jury.  The issue for all of us that the Court has pointed

25  out is how do we do that without unduly prejudicing the

1   defendant in the underlying case, in the case in chief.  So

2   I agree with the Government.  I've never done a bifurcated

3   trial in Federal court, I'm familiar with them in civil

4   proceedings and other things.

5           And I think, Judge, at this time, the

6   Government's not going to oppose, so what I would propose is

7   that we do bifurcate the trial and that, when we read the

8   Indictment to the jury, we do not read the enhancing

9   allegation.  We simply read the Count 1, which is the

10  possession with intent and we leave the enhancement out of

11  it and we do that all through the trial because that does a

12  couple of things:

13          If my client decides not to testify, then we

14  don't have to worry about that motion in limine that I had

15  filed earlier, about whether or not that pretty old drug

16  conviction comes in.  So that's one thing.  And I think it

17  just -- it keeps the jury focused on what we're here for

18  today.

19          So at this time, Your Honor -- and I know we're

20  going to have to retool the jury verdict, but that's a small

21  task.  I've already -- I think I've got a rough outline of

22  amended or supplemental verdict forms.  But I think we can

23  bifurcate the trial.  I would ask for a bifurcated trial.  I

24  would ask that we not mention the sentencing enhancement

25  allegation during the Government's case in chief.

1          And then that's going to bring us to another

2     issue, which we're going to need to address in just a few

3     minutes, Your Honor.  But have I answered the Court's

4     questions?

5          THE COURT:  Yes, I suppose you have.

6          Ms. Camacho, you don't have any objection to the

7     bifurcated proceeding?

8          MS. CAMACHO:  I do not.

9          THE COURT:  And let's just clean up the

10    Indictment that we're -- I'll read the Indictment as a part

11    of the preliminary instruction.  I won't say anything about

12    the 851.  And even if -- well, whether he testifies or not,

13    you're still going to have the length of sentence and the

14    dates because those things are not going to come out in the

15    cross-examination, so we're still going to have to have the

16    bifurcation, I think, whether he testifies or not.

17         MS. CAMACHO:  I was just going to say, Your

18    Honor, if he does testify and the prior comes out, I think

19    the defendant and defense counsel could then make a decision

20    about whether they wanted the bifurcation.  And my only

21    point would be the length of sentence and the time of the

22    sentence is not particularly aggravating in this case, so I

23    don't know if they would want to just go ahead and do it in

24    the case in chief, as long as the sentencing -- as long as

25    the fact of the conviction came out.  But that would

1    obviously be up to them, from my point of view.

2            THE COURT:  Well, I suppose it is up to you.  And

3    you have to make the tactical decision about whether he

4    testifies or not.  Typically, though, we would not have the

5    actual dates of conviction and any sentences served and any

6    revocation sentences and those dates served.  That,

7    typically, would not come in, so you'd have that call to

8    make at the time.

9            MR. CLARK:  That is correct, Your Honor.  But

10   that also leads us, Judge, I guess, to the next issue, if I

11   can address?

12           THE COURT:  Yes, yes, sir.

13           MR. CLARK:  I think, Your Honor, in order to

14   properly preserve the record for any appellate purpose, Your

15   Honor, the Court has ruled denying my motion in limine, so I

16   just need to object, make a proper objection to the Court's

17   ruling in that matter.  I understand the Court's analysis.

18   I respectfully disagree, and I must object to that

19   particular ruling and order.

20           Having said that, Your Honor, when I was reading

21   the order -- and you just brought up, in part of the order,

22   one of the issues is how are we going to handle this

23   enhancing factor.  As I went through the order, I was kind

24   of under the impression that, depending on how we handled

25   the enhancing factor, you still might hear a Rule 403

1    argument on the previous importation of marijuana case,

2    because, right now, it sounds like we're going to look at a

3    bifurcated trial --

4            THE COURT:  And when I issued the order, I wasn't

5    thinking in terms of a bifurcated trial.  I was thinking in

6    terms of an Indictment that has that language in it that's

7    going to be read to the jury, the prejudice already having

8    happened.

9            MR. CLARK:  Right.

10           THE COURT:  That was my thinking.  I invited

11   argument on a reconsideration basis, if we're going to do

12   something different and we are, so I'll hear you.

13           MR. CLARK:  Then, Your Honor, since we've now

14   removed that aggravating factor from the presence of the

15   jury for this underlying offense, I would now ask the Court

16   to reconsider its ruling on allowing that previous -- I

17   think it's 16 -- it's an old conviction, Your Honor.  I

18   think he got out of jail in 2005, but it's a very old

19   conviction.  And since the jury is not going to hear from

20   that in the underlying case, now I think that the Rule 403

21   analysis tips in favor of the defendant, so that, even if he

22   does testify, I would ask the Court to exclude that because

23   the only way it would come in during the case in chief

24   against him is if the Court rules it's proper impeachment.

25           THE COURT:  Ms. Camacho?

1          MS. CAMACHO:  And Your Honor, understanding

2     defendant's argument, but I would still ask that we be

3     allowed to bring it in, if the defendant testifies and if

4     his testimony becomes relevant in this case, if his

5     truthfulness becomes relevant in the case.  Even though this

6     is quite old, I think it is relevant in that it is a drug

7     conviction.  I think it's something that the jury can take

8     into account in terms of evaluating his truthfulness.  I

9     want -- especially when this is a drug case, but it is, as

10    the Court pointed out in its order, it is distinct.  It is a

11    marijuana conviction for importing marijuana.  It's not for

12    distributing drugs.  It's not for methamphetamine.  And so I

13    don't think that there is a terrible risk that the jury will

14    be overly prejudiced by it in some emotional way in terms of

15    thinking, "Well, if he sold that methamphetamine, he must

16    have done it in this case"; rather, it shows that he is

17    someone who has been involved in drug trafficking for years,

18    and I think that goes to his credibility, which he puts in

19    question when he takes the witness stand.

20         THE COURT:  All right.  Let me take the 609

21    question under advisement.  In the meantime, no mention of

22    it, of course, anywhere else.  And before -- I should have a

23    decision to you before Mr. Reynoso testifies or not, but

24    either way, approach before we go there, all right?

25         MS. CAMACHO:  Yes, Your Honor.

1          MR. CLARK:  One last issue, Judge.  I apologize

2     to the Court and Counsel.  In my motion in limine, I was

3     working off my laptop, Judge.  The Court caught it and the

4     Government caught it.  I referenced a May 22nd transaction,

5     and the date was actually August 22nd.  I just wanted to

6     clear that up on the record.  It has no bearing.  It doesn't

7     change any of the analysis.  It was just a typo on my part

8     when I was putting that motion together, Judge.

9          THE COURT:  Okay.  The record will so reflect.

10         So you-all have the questionnaires, the

11    additional questionnaires?

12         MS. CAMACHO:  We do, Your Honor.

13         THE COURT:  You've had a chance to look those

14    over?

15         MS. CAMACHO:  I have.

16         MR. CLARK:  I'm about halfway through, Judge.  I

17    think we still might be missing one.  But if I can get

18    through the stack, which, like I said, I'm about halfway

19    through, five more minutes, Judge, and I'll be ready.

20         THE COURT:  All right.  You've got five minutes.

21         Where are we -- Jess, is everybody ready to go

22    downstairs?

23         COURT CLERK:  Yes.

24         THE COURT:  So you've got five minutes till they

25    come up anyway, Mr. Clark.  But even if, before you get to

1    that, Jess said that there were a couple of issues.  One

2    juror needs hearing assistance and that's not a problem.

3                    (Discussion off the record.)

4                    So there's a juror that understands English, but

5    does not speak English, and I don't have a number on her.

6    Her initials are N.O.  And she's the one that needs hearing

7    assistance, but given the language impediment, we might

8    consider just letting her go now.  And a juror, his initials

9    are M.M., he needs an oxygen concentrator.  He didn't bring

10   his.  He thought that we would provide one.  That's a first

11   for me.  I've only done this a couple hundred times, but

12   that's still a first for me.  He lives here in town, though,

13   so maybe he could, you know, go get it, Jess?  Anyway...

14                    COURT CLERK:  Yeah, it's at night, Your Honor.

15                    THE COURT:  He only needs it at night?

16                    COURT CLERK:  Yes, Your Honor.

17                    THE COURT:  And we were going to provide it to

18   him at night?

19                    COURT CLERK:  That's what he told...

20                    (Discussion off the record.)

21                    MS. CAMACHO:  Your Honor, as to the juror who

22   does not speak English, I don't think jury deliberation

23   really works with that.  So if the Court's amenable, I have

24   no objection to releasing her now.

25                    MR. CLARK:  Your Honor, I don't have any issues

1    with it.

2              THE COURT:  You know what?  She may have already

3    been excused because I don't think she's on the list.  I

4    don't see her among the venire, so maybe that issue didn't

5    even -- it was resolved downstairs.

6              MS. CAMACHO:  And Your Honor, there was one other

7    gentleman who we just got the questionnaire with some

8    revised questions, Jesus Castaneda, that says he moved to

9    El Paso.  And he probably would have been struck anyway.  He

10   works for the District Attorney's Office, but I have no

11   objection to releasing him now, given the fact that he

12   doesn't live in the district.  I don't think he's eligible

13   to serve.

14             MR. CLARK:  Agreed, Your Honor.

15             THE COURT:  And is he -- do you see him on the

16   venire, Jess?

17             COURT CLERK:  I didn't catch the name.

18             MS. CAMACHO:  Jesus Castaneda.  I think he's here

19   because he filled out the questionnaire this morning.

20             COURT CLERK:  Number 42.

21             THE COURT:  All right.  Juror Number 42 will be

22   excused, then.

23             COURT CLERK:  And apparently, they let the other

24   one go.

25             THE COURT:  Yes.

1          Mr. Clark, I'll have them bring the jury up at

2     five after 9:00, so you've got a few more minutes to get

3     through your questionnaires.

4          MR. CLARK:  Thank you, Judge.  I need to confer

5     with the Government on getting those pants.  I know it's an

6     issue for us.  We can keep him here for a while, but I'd

7     still like the Government's help in getting some pants in

8     here.

9          THE COURT:  I'd forgotten about the pants already

10     again.

11          (Discussion off the record.)

12          MR. CLARK:  Thank you, Judge.

13          THE COURT:  All right.  I want to get on the

14     record with the jury at 9:30.  So somebody needs to get --

15          MS. CAMACHO:  I think what Mr. Clark was saying

16     is they could put the top on him and we could proceed with

17     jury selection --

18          MR. CLARK:  Right.

19          MS. CAMACHO:  -- but that we would work on

20     getting pants for a the rest of the trial.

21          THE COURT:  Isn't that a one-piece?

22          MR. CLARK:  It is, Judge.  I'd prefer the

23     9:30 thing, Your Honor, if the Court doesn't mind.

24          THE COURT:  Yeah, I'd prefer something other than

25     that, but 9:30, and he'd better have some new pants by then.

1        All right.  Thanks.

2   (Whereupon voir dire proceedings were heard and reported,

3   but are not herein included, pursuant to counsel's request.)

4                    (Jury present.)

5        Ladies and gentlemen, while I have you standing,

6   I'll administer the oath to you as the jurors that will

7   actually decide the case.  So would you raise your right

8   hand, please.

9        (Whereupon the jury was duly sworn under oath.)

10       Thanks.  Have a seat.

11       So, folks, the first thing we're going to do:

12  I'm going to read to you the preliminary instruction.  This

13  is an instruction that's generally designed to be given in

14  every trial, but it's tailored to fit the facts of this case

15  and the people involved in this case.  And that will take 15

16  or 20 minutes.  And then, ordinarily, we would start right

17  away with opening statements, but I don't think we can get

18  through both openings and the preliminary statement before

19  noon -- and it's my intention that you be out of here before

20  noon and you can always plan your day around that, you know,

21  we're going to have a pretty tight schedule -- so I'm going

22  to read this to you and then we'll see where we are.  But

23  now feel free to take notes, if you'd like, but you don't

24  have to take notes because much of what I'm going to tell

25  you, you're going to have in the final instructions that

1  will accompany you to the jury room before you decide the

2  case.  So do you have note-taking material there in front of

3  you?  All right.  So here we go.

4          Members of the jury, at the end of the trial, I

5  will give you detailed guidance on the law and on how you

6  will go about reaching your decision, but now I simply want

7  to generally explain how the trial will proceed.  This

8  criminal case has been brought by the United States

9  Government.  I'll sometimes refer to the Government as the

10  "prosecution."  The Government is represented at this trial

11  by Assistant United States Attorneys Renee Camacho and

12  Nichole Hammond.  The defendant, Mario Reynoso, is

13  represented by his attorney, Russell Dean Clark.

14          The Government charged the defendant with one

15  count of distribution of methamphetamine.  The Indictment is

16  simply the description of the charges made by the Government

17  against the defendant.  It's not evidence of guilt or

18  anything else.  The defendant pleaded not guilty and is

19  presumed innocent.  The defendant may not be found guilty by

20  you unless all 12 of you unanimously find that the

21  Government has proved the defendant's guilt beyond a

22  reasonable doubt.

23          The first step in the trial will be the opening

24  statements.  The Government, in its opening, will tell you

25  about the evidence that it intends to put before you.  Just

1    as the Indictment is not evidence, neither is the opening

2    statement.  Its purpose is only to help you understand what

3    the evidence will be.  It's a road map to show you what's

4    ahead.

5              After the Government's opening statement, the

6    defendant's attorney may make an opening statement.

7              Evidence will then be presented from which you

8    will have to determine the facts.  The evidence will consist

9    of the testimony of the witnesses, documents, and other

10   things received into the record as exhibits, and any facts

11   about which the lawyers agree or to which they stipulate.

12   The Government will offer its evidence.

13             After the Government's evidence, the defendant's

14   lawyer may make an opening statement and present evidence,

15   but is not required to do so.  I remind you that the

16   defendant is presumed innocent and it is the Government that

17   must prove the defendant's guilt beyond a reasonable doubt.

18   If the defendant submits evidence, the Government may

19   introduce rebuttal evidence.

20             At times during the trial a lawyer may make an

21   objection to a question asked by another lawyer or to an

22   answer by a witness.  This simply means that the lawyer is

23   requesting that I make a decision on a particular question

24   of law.  Do not draw any conclusion from such objections or

25   from my ruling on those objections.  If I sustain an

1    objection to a question, the witness may not answer it.

2    Don't attempt to guess what answer might have been given if

3    I had allowed the answer.  If I overrule the objection,

4    treat the answer as any other.  If I tell you not to

5    consider a particular statement, you may not refer to that

6    statement in your later deliberations.  Similarly, if I tell

7    you to consider a particular piece of evidence for a

8    specific purpose, you may consider it only for that purpose.

9              During the course of the trial, I may have to

10   interrupt the proceedings to confer with the attorneys about

11   the rules of law that should apply.  Sometimes we will talk

12   briefly here at the bench, but some of these conferences may

13   take more time, so I will excuse you from the courtroom.

14   I'll try to avoid such interruptions whenever possible, but

15   please be patient even if the trial seems to be moving

16   slowly because conferences often actually save time in the

17   end.

18             During the course of the trial, I may ask a

19   question of a witness.  If I do, that does not indicate that

20   I have any opinion about the facts in the case.  I'm only

21   trying to bring out facts that you may consider.  You are to

22   consider all of the evidence received in this trial.  It

23   will be up to you to decide what evidence to believe and how

24   much of any witness' testimony to accept or reject.  You and

25   you, alone, are the judges of the facts.

1          Now, as you know, I'm the judge presiding over

2     the trial.  You'll notice that, when I come into the

3     courtroom, Ms. Chavez says, "All rise."  Everyone rises when

4     I enter and leave the courtroom as a sign of respect for the

5     judicial office.  You, as judges of the facts, are accorded

6     that same respect, and we will all rise as you come in and

7     as you depart the courtroom.

8          You should give careful attention to the

9     testimony and exhibits because, based upon this evidence,

10    you will decide whether the Government has proved beyond a

11    reasonable doubt that the defendant has committed the crime

12    charged in the Indictment.  You must base that decision only

13    on the evidence in the case and my instructions on the law.

14         You will have the exhibits with you when you

15    deliberate.  And after you've heard all the evidence from

16    both sides, the Government and the defendant will both be

17    given time for their final arguments.

18         The final part of the trial occurs when I

19    instruct you on the rules of law which you are to use in

20    reaching your verdict.  I will give you detailed

21    instructions on the law at the end of the case, and those

22    instructions will control your deliberations and decision.

23    But in order to help you follow the evidence, I'll now give

24    you a brief summary of the elements of the offense that the

25    Government must prove to make its case.

1          The defendant is charged in the Indictment with a

2     single count of distribution of a controlled substance,

3     5 grams and more of methamphetamine, in violation of

4     21 U.S.C. § 841(a)(1) and (b)(1)(B).  To find the defendant

5     guilty, you must be convinced that the Government has proved

6     each of the following beyond a reasonable doubt:

7          Number 1, defendant knowingly or intentionally

8     distributed a controlled substance, as charged;

9          Number 2, the substance was, in fact,

10    methamphetamine; and

11         Number 3, the amount of the controlled substance

12    distributed by the defendant was at least 5 grams.

13         If you'd like to take notes during the trial, you

14    may.  On the other hand, you're not required to take notes.

15    If you do take notes, please be careful not to get so

16    involved in the note-taking that you become distracted.  And

17    remember that your notes will not necessarily reflect

18    exactly what was said, so your notes should be used only as

19    memory aids.  Therefore, you shouldn't give your notes

20    precedence over your independent recollection of the

21    evidence.  You should also not be unduly influenced by the

22    notes of other jurors.  If you do take notes, please leave

23    them in the jury room at night and don't discuss the

24    contents of your notes until you begin your deliberations.

25         We do have an official court reporter making

1    stenographic notes of everything that is said here at the

2    trial.  This is basically to assist with any appeals.  We'll

3    not have the typewritten transcripts of this record

4    available for your use in reaching a decision in this case.

5    On the other hand, all the exhibits will be available to you

6    during deliberation.

7            Ordinarily, the attorneys will develop all the

8    relevant evidence that will be necessary for you to reach

9    your verdict.  However, in rare situations, a juror may

10   believe a question is critical to reaching a decision on a

11   necessary element of the case.  In that exceptional

12   circumstance, you may write out a question and provide it to

13   the courtroom deputy while the witness is on the stand.

14   I'll then consider that question with the lawyers.  If it is

15   determined to be a proper and necessary question, I'll ask

16   it.  If I don't ask it, you should not -- you should

17   recognize that I have determined it is not a legally

18   appropriate question and you should not worry about why it

19   was not asked or what the answer would have been.

20           During the course of the trial, you shouldn't

21   talk with any witness or with any of the lawyers.  The

22   lawyers in this case are aware of this and, should you

23   happen to see any of them outside the courtroom, they will

24   and should ignore you.  Please don't take offense.  They

25   will only be acting properly by doing so.

1          In addition, during the course of the trial, you

2     should not talk about the trial with anyone else, including

3     each other, your family members, or your friends.  You

4     shouldn't discuss this case among yourselves until I have

5     instructed you on the law and you've gone to the jury room

6     to deliberate and make your decision at the end of the

7     trial.  After you retire to deliberate, you may begin

8     discussing the case with your fellow jurors, but you can't

9     discuss the case with anyone else until you have returned a

10    verdict and the case is at an end.  It's important that you

11    wait until all the evidence is received and you've heard my

12    instructions on the controlling rules of law before you

13    begin your deliberations.

14         You, as jurors, must decide this case based only

15    on the evidence presented here within the four walls of the

16    courtroom.  This means that, during the trial, you must not

17    hear or read about the case in the media and you must not

18    conduct any independent research about this case, the

19    matters in this case, or the individuals involved.

20         I don't know that there's going to be any media

21    attention to this case, ladies and gentlemen.  Typically,

22    we'd know that, but if there were something on the TV or,

23    you know, in the newspaper about it, you should just ignore

24    it.  I don't expect it.

25         You must not additionally attempt to gather any

1    information on your own from any source outside this

2    courtroom that you think might be helpful in deciding the

3    case.  Don't engage in any outside reading, don't attempt to

4    visit any places mentioned in the case, and don't in any

5    other way try to learn about the case outside the courtroom.

6    Don't consult dictionaries or reference materials, search

7    the internet or use any electronic tools or print reference

8    materials to obtain information about this case or to help

9    you decide it.  The reason for this is that your decision in

10   this case must be made solely on the evidence presented here

11   at trial.

12           I hope that all of you -- for all of you this

13   case is interesting and noteworthy.  However, certain

14   developments in technology compel me to point out that some

15   daily activities many of you may enjoy are strictly

16   forbidden in your role as jurors.  I know that many of you

17   use cell phones, SmartPhones, the internet, and other tools

18   of technology.  You must not use these tools to communicate

19   electronically with anyone about this case.  This includes

20   your friends and family.  You may not communicate with

21   anyone about the case on your cell phone, through e-mail,

22   SmartPhone, text messaging, through any blog or website,

23   including Instagram, Facebook, Snapchat, Twitter, LinkedIn,

24   or YouTube.  You may not use any similar technology of

25   social media even if I have not specifically mentioned it

```
1    here because there's probably some new app that's been
2    developed this morning that I wouldn't know to mention.
3            What you may do is advise anyone who needs to
4    know such as family members, employers, employees, schools,
5    teachers, or daycare providers that you are a juror in a
6    case and that the judge has ordered you not to discuss it
7    until you've reached a verdict and have been discharged.
8    Once you've been discharged, you're free to discuss this
9    case or investigate anything about it as you wish.
10           Before -- well, before we conclude the
11   preliminary statement, let me give you a quick rundown
12   regarding scheduling and a few other logistical details:
13           A typical trial day begins at 9:00.  We have one,
14   20-minute break about halfway between 9:00 and noon and then
15   we'll take a lunch break that goes from noon until 1:15.
16   We'll reconvene at 1:15 and go till 5:00 with one, 20-minute
17   break that goes to the midway break in the afternoon.  You
18   are free to have waters or sodas there in the jury box, but
19   because I've told you we have only the one, 20-minute break,
20   please be judicious about your liquid intake.
21           If, during the trial, you can't hear or see
22   something that's happening, things aren't going as we intend
23   them.  All of what we do and all of what we say over the
24   course of the next couple of days is for your benefit, for
25   you to help decide this case.  So if -- occasionally, not
```

1    these lawyers, but occasionally, some other lawyers walk

2    away from microphones when they're talking and you can't

3    hear them, others may have an exhibit that's displayed and

4    they might walk in front of you or maybe the farthest jurors

5    can't see it.  If those any of those things apply, please

6    let us know right away because we want everyone to hear and

7    see everything that's happening.

8            If anyone -- on that question, on that issue,

9    anyone needs hearing assistance, we have headphones

10   available that are -- they're kind of cool.  They're

11   microwave or laser or something, I don't know.  They work

12   through the system, the mic system in the courtroom, and

13   they're pretty handy.  So if anybody needs it, let Jess

14   know.

15           Did you bring cell phones with you?  Did you

16   bring them in the courtroom?  You're not able -- you should

17   turn them off now, of course, if you haven't thought to

18   already.  And that applies to everybody in the courtroom.

19   But please keep in mind, you know, you should have them off

20   when you come back into the courtroom.

21           And I was just sitting here thinking a minute

22   ago, gosh, it's hot up here.  I'm a little higher than you

23   guys and I'm wearing it polyester robe, so I'm hot all the

24   time.  It's hard to make everybody happy, though.  If you

25   tend to be cool, maybe bring a sweater or something, you

1    know, so that we don't freeze you out.  But if you are

2    uncomfortable, let Jess know, and we'll do what we can to

3    adjust the temperature.

4              As I indicated earlier, I have a back issue and

5    you will see me, during the trial, stand up and just stand

6    behind my chair rather than sitting throughout.  If you have

7    such an issue, please let Jess know.  We can rearrange you.

8    If you happen to be on the front row, we can put you in the

9    back row so, when you stand, you're not obstructing anyone's

10   sight line.

11             All right.  So we don't have time to get to both

12   openings before lunch and I don't want to split them, so

13   we're going to take an early lunch today.  We'll reconvene

14   at 1:15.  Between now and then, Jessica is going to take you

15   back to the jury suite and show you where you'll gather when

16   you come back from lunch.

17             And let me just remind you, please don't think or

18   talk about the case yet.  You know very little about it, but

19   any talk or discussion would be premature.  And if anyone

20   were to come up to you and try engage you about the trial

21   during your lunch break, that would be inappropriate.  Tell

22   them, you know, "I'm a juror, I'm not supposed to talk about

23   things."  And if they were to persist, that's the sort of

24   thing you ought to tell me when you get back.  That won't

25   happen.  Never has happened.  But just a warning.

1          Lots of great places to eat just close by the

2     courthouse.  And we will see you back here, ready to go to

3     work, at 1:15, and we'll have the opening statements at that

4     time.  Thanks very much.

5          And we'll all rise as you depart.

6                    (Jury not present.)

7          Thanks, everyone.  We'll reconvene at 1:15 with

8     the Government's opening.  Keep it to ten minutes or so and

9     that's great.  If you had said 30 minutes, I'd have let you

10    have it, but you both said ten, so...

11         MR. CLARK:  Your Honor, can I bring up one issue?

12    I hate to do this, I know we've got a minute, it won't take

13    long, but I'd like to address the 404(b) issue, if I may,

14    Judge?

15         THE COURT:  Yes, sir.

16         MR. CLARK:  Thank you.  Your Honor, we talked

17    about the Court's order earlier.  And I certainly respect

18    that, but I wasn't able to enunciate at least half of what I

19    was hoping the Court would consider.  The Court has ruled

20    that, after this incident, this May 8th incident, that there

21    was an August arrest in El Paso, and then when my client was

22    arrested in this case, in January.  And the Court has ruled

23    that both of those are proper 404(b) evidence.

24         What I was hoping the Court would consider is,

25    one out of the two, I can certainly understand, but once we

```
 1   start introducing the two of them, I think it becomes

 2   overkill, and that was what I was hoping to address.  I

 3   understand the Government's -- and the Court's ruled

 4   knowledge, intent, lack of mistake.  I understand the

 5   Court's basis for that.  And I think we can get that done

 6   with maybe the August arrest or the January arrest, but two

 7   of them is just heaping coals, Judge.  And I would ask the

 8   Court to reconsider; maybe limiting to just one of those

 9   events, Your Honor.  And I apologize for off-the-fly

10   presentation, Judge.

11           THE COURT:  Okay.  I'll let Ms. Camacho respond

12   to that later, if she chooses.  This morning's discussion

13   was about 609.  And I had invited the reconsideration on the

14   609 issue.  I don't know that I invited reconsideration on

15   the 404 issue.

16           But Ms. Camacho, if you want to respond to that,

17   did you have any intention of going there in your opening --

18           MS. CAMACHO:  Yes, Your Honor.

19           THE COURT:  -- on the -- on the 404(b) stuff?

20           MS. CAMACHO:  Yes, Your Honor, briefly in the

21   opening, but yes.

22           THE COURT:  Well, respond, if you'd like.

23           MS. CAMACHO:  So Your Honor, we do believe that

24   the Court was correct in its ruling that both of those

25   incidents should be admitted.  And we actually have a little
```

1    bit more information even than we had when we first filed

2    our 404(b) notice.  So in -- with regard to the

3    distribution, lack of mistake and the sort of signature

4    quality of these.

5            So in the August 22nd instance, the defendant was

6    arrested.  He had various other drugs, but as specifically

7    the methamphetamine, he had two, 1-ounce baggies of

8    methamphetamine, as well as 19 very small baggies of

9    approximately 1 gram each of methamphetamine, which clearly

10   shows intent to distribute and distribution of

11   methamphetamine.  What's important about the two, 1-ounce

12   baggies is that they were between 23 and 24 grams each,

13   which is a good 3 or 4 grams short of a full ounce and is

14   sort of a signature quality, as that was exactly the issue

15   in the methamphetamine that he sold to the undercover agent.

16   And part of the evidence that we're going to put on is the

17   fact that these were -- these were short.  He was talking

18   about them being "Mexican ounces," which is slang for like a

19   25-gram quantity and, even then, they were short, which is

20   the same, exact scenario in the 2-ounce baggies that we had

21   on August 22nd.  And he had roughly $4,500 in cash on

22   August 22nd.

23           And then on the January -- as the Court noted in

24   its order, he was driving the exact, same vehicle that he

25   had been driving when he sold the methamphetamine to the

1    undercover agent.  And then, in the January incident, he

2    once again, was driving the exact, same vehicle and this

3    time he had -- and he had, again, roughly $4,500, $4,700 in

4    cash in his pocket.  And this time, he had seven, 1-ounce

5    baggies of methamphetamine in the vehicle and, once again,

6    those bags were short.  When you add up the amount of the

7    meth and divide it by seven, it was -- they were roughly 23,

8    24 grams each.

9                And so we do believe that that is sort of an MO,

10   a signature quality to the evidence and that it all

11   appropriately comes in, as the Court ordered.

12               THE COURT:  Mr. Clark's basis, though, for asking

13   me to reconsider was that one is enough, two is piling on.

14               MS. CAMACHO:  I don't believe that to be the

15   case, Your Honor, when the defendant is -- from what we have

16   seen, intends to contest his identity.  And his identity as

17   a person who is selling meth in this vehicle, with these

18   sort of short ounces of meth is what we have to prove.  And

19   while one incident certainly assists us in proving that,

20   when it is our burden to prove it beyond a reasonable doubt,

21   I think that the jury can't really see it as sort of a

22   signature, an MO, unless they're seeing that this is

23   something that is happening repeatedly, which certainly

24   gives rise to the conclusion that it was, indeed, him who

25   was there on the first instance.  So rather than piling it

1    on, I think it actually shows the jury that this is sort of

2    a pattern rather than just we caught him once like this and,

3    therefore, it must have been him the other time.

4         THE COURT:  I think two instances may be

5    coincidence, three is suggestive of a pattern or a

6    signature, so I'll respectfully decline to reconsider the

7    earlier ruling and allow them both in.

8         MR. CLARK:  Thank you, Your Honor.  Thank you for

9    allowing me to be heard.

10         THE COURT:  Thank you.

11              (A recess was taken.)

12         Thanks, everyone.  Are we ready to bring the jury

13    in?

14         MS. CAMACHO:  Yes, Your Honor.

15         MR. CLARK:  We are, Your Honor.

16         THE COURT:  All right.  Jess, please.

17              (Jury present.)

18         Thanks, everyone.  Take your seats, please.

19         Welcome back, ladies and gentlemen.  Hope

20    everybody had a good lunch.  And now the trial begins with

21    opening statements, as I had told you earlier.

22         Who's got the opening for the Government?

23    Ms. Hammond?

24         MS. HAMMOND:  Yes, Your Honor.

25         THE COURT:  Please.

1          MS. HAMMOND:   Members of the jury, this case is

2     about a man, Mario Reynoso, who sold over 47 grams of pure

3     methamphetamine on May 8th, 2018, in Sunland Park, Doña Ana

4     County, New Mexico.   This case is about a man who knew what

5     he was doing and who was careful about how he did it, but he

6     wasn't careful enough, so now he's sitting before you,

7     charged with methamphetamine distribution.

8          On May 8th of last year, around 2:00 o'clock in

9     the afternoon, the defendant pulled into the parking lot of

10    the Sunland Park Racetrack and Casino in his 2011 gray Ford

11    Fusion to meet with a man who had agreed over the phone to

12    purchase 2 ounces of methamphetamine from the defendant for

13    $400 per ounce.   What the defendant didn't know is that this

14    man was a Federal agent, working undercover, Agent Omar

15    Lujan, who you'll hear from later today.   Federal agents set

16    up cameras in the parking lot to record the event, but the

17    windows of the Ford Fusion were heavily tinted, so you can't

18    see inside.   We're going to play that video for you, but

19    Agent Lujan is going to tell you everything that happened

20    inside that vehicle.

21          Agent Lujan got in the back seat and shut the

22    door.   The defendant, who was sitting in the driver's seat,

23    turned to face the agent.   And the agent got a clear look at

24    his face, his torso and his right arm.   There was also a

25    woman in the vehicle sitting in the front passenger seat,

1   but the agent didn't get a good look at her.

2          The defendant pointed the agent to a Band-Aid box

3   in the center console of the vehicle.  The agent took the

4   box, paid the defendant the $800, and exited the vehicle.

5   Inside that Band-Aid Box was over 47 grams of

6   methamphetamine, about 7 grams short of the two-ounce sale

7   that the agent and the defendant had agreed upon over the

8   phone.

9          That same day, Federal agents took the Band-Aid

10  box with the methamphetamine and submitted it for testing at

11  the New Mexico Department of Public Safety's southern

12  forensic laboratory here in Las Cruces.  In the process, the

13  bag of meth was taken out of the box and put into an

14  evidence bag.  You'll see on that evidence bag there's a

15  mistake.  In the place where the offender's name should be,

16  someone hand wrote in "Mario Hernandez," not "Mario

17  Reynoso."  It was a mistake akin to a typo, and now what we

18  need for you to decide is this:

19         Was it Mario Reynoso who sold Agent Lujan over

20  47 grams of methamphetamine on May 8th, 2018, in the Sunland

21  Park casino parking lot?  And we're going to introduce

22  evidence to help you make that determination.

23         You're going to hear that months before that

24  controlled buy on May 8th, Federal agents received

25  information that a man who went by Mario, a man who drove a

1   2011 gray Ford Fusion registered to Mario Reynoso, a man

2   with an area code 915 phone number subscribed to by a Mario

3   Reynoso, was selling methamphetamine in southern New Mexico

4   and El Paso, Texas.  And we have that vehicle title and

5   registration and that phone subscriber information for you

6   to review.

7           Based on that information, Federal agents working

8   with a confidential source relayed Agent Lujan's phone

9   number to the defendant under the guise of connecting the

10  defendant with an interested methamphetamine buyer.  Then,

11  on May 3rd, five days before the controlled buy, the

12  defendant called Agent Lujan from that 915 phone number and

13  identified himself as Mario.  The call was recorded and

14  we're going to play it for you later today.  We're also

15  going to play for you recorded calls that the defendant has

16  made from jail since he was arrested for the charge he's now

17  facing.  You're going to hear that it's the same voice, the

18  defendant's voice, in all of those calls.

19          In that initial call that the defendant made to

20  Agent Lujan, the agent told the defendant that he had heard

21  that the defendant could probably give him "like one or

22  two."  And the defendant responded, "I'll give them to you

23  for four."  You're going to hear some conversations like

24  this during the trial where the defendant just uses numbers

25  when what he really means are amounts of methamphetamine and

1   prices for that methamphetamine.  And you'll hear from

2   Federal agents just how common this type of talk is in drug

3   trafficking.  The defendant knew what he was doing and he

4   was careful about how he did it.

5           You're going to hear five more calls between the

6   defendant and Agent Lujan setting up the deal at the casino

7   parking lot on May 8th.  And we're going to show you other

8   calls and text messages where the defendant sets up other

9   drug deals and discusses payments with his wife and his

10  associates.

11          After that, you're going to hear from a Texas

12  state narcotics officer, who encountered the defendant two

13  more times after Agent Lujan bought methamphetamine from the

14  defendant on May 8th, 2018.  Both times, the defendant was

15  driving the same 2011 gray Ford Fusion that he was driving

16  on May 8th.  Both times, the defendant was carrying over

17  $400 in cash, rubber-banded together, on his person.  And

18  both times, law enforcement found large quantities of

19  methamphetamine far exceeding personal use amounts in his

20  vehicle.  Over 65 grams in August 2018, and over 159 grams

21  in January 2019, the same day the defendant was arrested for

22  the charge he's now facing.

23          And finally, we're going to play a recorded jail

24  call for you that the defendant made about one week after he

25  was arrested for the sale of methamphetamine to Agent Lujan

 1    where he tries to remember who was with him that day in

 2    Sunland Park.  Not whether he was there, not whether it

 3    happened, just who was with him in the car when it happened.

 4    You're going to hear the defendant tell a friend to ask a

 5    woman named Brigette, "Ask her if she was with me in the car

 6    that day that happened.  Ask her if she remembers that we

 7    went to Sunland Park or was it Victoria?  I can't remember

 8    who it was."

 9         At the end of this trial, we're going to come

10    back and we're going to ask you to ask yourselves, do you

11    have any reasonable doubts about who drove that Ford Fusion

12    with a woman in the front passenger seat into the Sunland

13    Park casino parking lot on May 8th, 2018, to sell

14    Agent Lujan over 47 grams of methamphetamine?  And I submit

15    that, by the time you have to answer that question, the

16    answer will be clear because we'll have shown you beyond any

17    reasonable doubt that it was the defendant, Mario Reynoso.

18         Thank you.

19         THE COURT:  Mr. Clark.

20         MR. CLARK:  Thank you, Judge.  May it please the

21    Court and Counsel.

22         THE COURT:  Yes, sir.

23         MR. CLARK:  Ladies and gentlemen, thank you for

24    your patience in joining us these next couple of days.

25    There are a couple of rules I would just like to remind you

42

1    of and a couple of things I'd like to ask you to do as we

2    litigate this case.  And the first thing I want to ask you

3    to do is to withhold judgment until all the evidence is in

4    and the judge sends you back to deliberate.  Just wait, hold

5    tight, and you can reach a conclusion later on.

6           The second thing I want you to do or I would ask

7    respectfully to do is never for a minute forget the burden

8    of proof.  You remember, we talked a little bit about that

9    in voir dire.  I'm going to ask you to not for one minute

10   forget that the Government bears the burden of proving its

11   case beyond a reasonable doubt.  We don't have to do

12   anything.

13          The Government has presented its version and a

14   summary of the evidence that's going to come and you're

15   going to see we're not going to dispute a whole lot of that.

16   I'm going to frame the issue for you nicely.  This case

17   comes down to who was driving a gray Ford Fusion on May 8th

18   of 2018.  That's what this case comes down to.  The other

19   stuff in El Paso, the Government's got its reasons for

20   presenting that, but you have to be convinced at the end of

21   this trial beyond a reasonable doubt they've proved Mario

22   Reynoso was in that car.

23          Now, throughout the case, I'm going to try to

24   present certain facts that I think kind of shoot a hole in

25   that theory.  I don't have a lot for you because you know

1    what our defense is now.  And I'm going to ask that you kind

2    of focus, because he's on trial.  And I want to remind you

3    something, too, Mario Reynoso is on trial for the events of

4    May 8th.  He's not on trial for what happened in August in

5    El Paso.  He's not on trial for what happened in January.

6    So at the end of the day, all of your efforts are going to

7    go in to deciding May 8th.

8            Ladies and gentlemen, that's all that I have for

9    you.  Thank you.

10           THE COURT:  Thank you, Mr. Clark.

11           Ms. Camacho, your first witness.

12           MS. CAMACHO:  Yes, Your Honor, the United States

13   calls Omar Lujan.

14                        **OMAR LUJAN**,

15           After having been first duly sworn, did make the

16   following answers:

17                     **DIRECT EXAMINATION**

18           THE COURT:  Thank you.  Have a seat.

19           The mic is on, you can roll right up to it.

20           Ms. Camacho.

21           MS. CAMACHO:  Thank you, Your Honor.

22   Q.  (BY MS. CAMACHO):  Could you please state your

23   name for the record.

24   A.  Omar Lujan.

25   Q.  How are you employed, Agent Lujan?

1    A.   I am a Criminal Investigator Special Agent for

2    Homeland Security Investigations.

3    Q.   And Homeland Security Investigations, is that commonly

4    known as "HSI"?

5    A.   Yes.

6    Q.   How long have you been an HSI agent?

7    A.   Came on board in 2007, so going on 12 years.

8    Q.   What did you do before that?

9    A.   I was with the El Paso Police Department, a patrolman,

10   detective.

11   Q.   What kind of training did you go through to become an

12   HSI agent when you switched from being a local detective to

13   a Federal agent?

14   A.   I went through a six-month academy in Glencoe,

15   Georgia.

16   Q.   And as an HSI Agent, do you specialize in any

17   particular type of case?

18   A.   Right now, for several years now, I have specialized

19   in narcotics cases, gun cases, money cases, a lot of that

20   stuff.

21   Q.   And looking at the narcotics cases, how long have you

22   been working on narcotics cases as one of your specialties?

23   A.   Since 2002.

24   Q.   So even before you became a Federal agent?

25   A.   Correct.

1    Q.    And do you participate in the what we call "undercover

2    work"?

3    A.    Yes.

4    Q.    How long have you been doing undercover work?

5    A.    Since 2002, so roughly around 17 years, approximately.

6    Q.    Have you received special certification through HSI to

7    do that work?

8    A.    Yes.

9    Q.    And what do we mean when we talk about being an

10   undercover agent or doing undercover work?  What does that

11   entail?

12   A.    Pretty much you portray to be somebody you're not.  So

13   depending on the nature of the case, if they're looking for

14   a gun buyer, you pose to be a gun buyer.  In this particular

15   case, they were looking for somebody that would buy

16   street-level narcotics.

17   Q.    So you were pretending to be a narcotics distributor?

18   A.    Buyer, actually.

19   Q.    Buyer?

20   A.    Correct.

21   Q.    Okay.  During your work as an undercover agent, you

22   said since 2002, so I think that's about 17 years, can you

23   give me a rough estimate of how many undercover narcotics

24   purchases you've made?

25   A.    I would say, on the low end, about 700.  High end,

1   probably a little -- way over that.

2   Q.   And approximately how many or what percentage of those

3   narcotics purchases involved methamphetamine?

4   A.   Well, it's a -- about 200, probably a little bit more

5   than that.  Because I'm trying to go back when meth pretty

6   much became popular, and I was also a detective with

7   Narcotics.  So that was back in 2004, so probably over 200.

8   Q.   And does methamphetamine continue to be one of the

9   sort of more common drugs that you purchase today?

10   A.   It is nowadays, yes.

11   Q.   When you're doing an undercover deal, when you're

12   pretending to be a narcotics trafficker or purchaser and

13   you're going to meet with somebody who is going to sell you

14   drugs, what are the important things to you to make sure

15   happen during those encounters?

16   A.   Well, one of the most important things is safety first

17   for the UC, for the undercover, safety for the team that's

18   watching your safety -- for the team that's covering your

19   meets.  Pretty much there's a lot more to it.  You have to

20   be careful how you speak to a lot of these targets because a

21   lot of it is spoken in code and any time you refer to actual

22   cocaine as "cocaine," they pretty much shut you down and

23   they know either you're an informant or a cop.

24   Q.   So you kind of have to talk their lingo?

25   A.   Correct.

1    Q.   What about identifying the individuals you're talking

2    to?  How do you go about doing that or that you're meeting

3    with?

4    A.   Well, there are several ways.  Usually, if they

5    already have them pre-identified before the actual meet,

6    they will push out a picture of the individual that we're

7    supposed to meet, so I'll look at the picture and, that way,

8    beforehand -- that way, during the meet, if it matches, then

9    we know that that's the same individual.  After the -- if we

10   don't have that access, after the actual meet, they'll try

11   to identify them based on the vehicle that they drove in and

12   then they'll supply a picture at that point after the meet

13   to see if that's the same individual.

14   Q.   And you referred several times to "they" doing

15   something, "they" providing you a picture, "they"

16   identifying it.  Who are you referring to?

17   A.   Yeah, because mostly, when I do undercover work,

18   there's a case agent assigned to the case that I'm working.

19   So when I refer to "they," I'm talking about the case agent,

20   the case agents.  Usually, there's one or there's two.  And

21   then they have a group that they belong to that does the

22   covers for the meets and stuff like that.  So usually, I'll

23   rely information to the case agent or to somebody assigned

24   to that agent's group.

25   Q.   So would I be correct that when you're doing

1   undercover purchases, you're not in charge of the whole

2   investigation, you're just coming in to do the purchase; is

3   that correct?

4   A.   That's correct.

5   Q.   And the case agent is in charge of the overall

6   investigation?

7   A.   Correct.

8   Q.   Now, you discussed that sometimes you're given a

9   photograph if the other agents are able to identify the

10   suspect beforehand.  How does that -- well, does that assist

11   you in being able to identify the person you're meeting

12   with?

13   A.   Oh, yes, a lot.

14   Q.   In what ways does having a photograph beforehand help

15   you?

16   A.   Well, as soon as I make contact with the individual

17   that's part of the investigation, if the picture that I just

18   saw hours before during the briefing, I'm going to know

19   right away if it's going to be the same individual or not.

20   I mean, you kind of -- that's one of the give-mes or one of

21   the advantages of being identified prior to the meet.

22   Q.   Have you ever had it happen where the case agent gives

23   you a photograph of the person they think you're going to

24   meet with and yet somebody else shows up?

25   A.   Yes.  It happened to me two weeks ago.

49

1    Q.   What do you do in that situation?

2    A.   What I do usually, I'll -- just so we can be on the

3    same page as far as the cover team, I'll relay that

4    information on the phone to the case agent or someone

5    belonging to the group.  I'll let them know that this

6    individual that showed up is not the same one in the

7    picture.  That way, everybody can be aware.

8    Q.   And you referenced a moment -- or a few questions ago,

9    you used the abbreviation "UC."  Is that just an

10   abbreviation for an undercover agent?

11   A.   That's correct.

12   Q.   How did you -- turning to this present case, how did

13   you come to be involved in the investigation regarding the

14   defendant, Mario Reynoso?

15   A.   On May the 1st, I was contacted by a case agent here

16   in Las Cruces that he had a phone number to an individual by

17   the name of Mario that was selling ounces of meth.

18   Q.   May 1st of what year?

19   A.   I'm sorry.  May 1st of 2018.

20   Q.   Do you maintain a phone or a phone number that can be

21   used just for undercover purchases?

22   A.   Yes.

23   Q.   Did you provide your phone number to the case agent as

24   well?  Your undercover phone number.

25   A.   Yes.

1    Q.    Were you given the phone number of the suspect that

2    they -- Mario that they knew was selling methamphetamine?

3    A.    Yes.  Actually, I gave the case agent -- he gave me

4    his number, Mario's number, and I gave my number to the case

5    agent.

6    Q.    And did Mario Reynoso or Mario get in contact with

7    you?

8    A.    Yes.

9    Q.    Do you remember on what date?

10   A.    I believe that was on the Thursday, May the 3rd -- I

11   believe it was a Thursday -- of 2018.

12   Q.    And do you remember what phone number the defendant

13   was calling you from?

14   A.    I believe it was (915) 549-2841.

15   Q.    Did you speak with him when he called you?

16   A.    Yes.

17   Q.    And let me ask you first, did he text you first or did

18   he call you first?

19   A.    The initial contact was via text.  He sent me a text.

20   Q.    And then called you?

21   A.    And then he called me right after.

22   Q.    Was it always from that same phone number that you

23   just talked about, the one that ends in -2841?

24   A.    Yes.  He never changed numbers.  It was always the

25   same one.

1    Q.   You never had any contact with him on a different

2    phone number?

3    A.   No.

4    Q.   Did you only receive incoming calls and texts from him

5    or did you also call and text him?

6    A.   It went both ways.  He would call me, I would call

7    him.

8    Q.   When you called that phone number, was it always the

9    defendant, Mario Reynoso, who answered you?

10   A.   Yes.

11   Q.   Did anyone else ever answer that phone?

12   A.   No.

13   Q.   And were all your calls on one day or did they span a

14   few days or weeks?

15   A.   No, it wasn't one day.  First call, I guess, was May

16   the 3rd.  And I think the last communication that I had with

17   him, the last call, was around June the 6th or around there.

18   Q.   So I've placed in front of you a stack of disks, CDs,

19   that are marked as Government's Exhibits 2 through 9.  And

20   those are audio recordings and paper copies of 2(a) through

21   9(a) that are written documents.  Have you reviewed those

22   exhibits before coming to court today?

23   A.   Yes, I did.

24   Q.   What are they, starting with the disks, if you will?

25   A.   These are the recordings of the telephone calls and

 1    texts that I had with Mario.

 2    Q.    So the audio recordings would just be the calls, not

 3    the text messages, correct?

 4    A.    Correct, correct.

 5    Q.    And are those true and accurate copies of the phone

 6    conversations that you had with the defendant?

 7    A.    Yes.

 8    Q.    And looking at the paper copies, can you tell me what

 9    2(a) through 9(a) are?  Are those transcripts of those same

10    audio calls?

11    A.    Yes, they are.

12    Q.    Have you also reviewed those before coming to court

13    today?

14    A.    Yes, I did.

15    Q.    To the best of your ability, are those transcripts and

16    where they're transcribed -- I'm sorry, transcripts and

17    where it's translated true and accurate?

18    A.    Yes.

19    Q.    And do you speak Spanish, Agent?

20    A.    Yes.

21    Q.    Fluently?

22    A.    Yes.

23    Q.    Also, if you would look at Government's Exhibit 10,

24    which is one of the paper exhibits, the last paper exhibit,

25    can you tell me what that is?

1    A.    That's the text messages that I had with Mario.

2    Q.    And have you also reviewed that?

3    A.    Yes.

4    Q.    Are those text messages accurate renditions of the

5    text messages that you exchanged?

6    A.    Yes, they are.

7              MS. CAMACHO:  Your Honor, at this time, I would

8    move for admission of Government's 2 through 9 and

9    Government's Exhibits 2(a) through 9(a), along with

10   Government's Exhibit 10, which is the text messages.

11             THE COURT:  Mr. Clark?

12             MR. CLARK:  Your Honor, I object.  There's a lack

13   of authentication under Rule 901 and I prefer to voir dire

14   the witness in that matter or we can approach, Judge.

15             THE COURT:  Voir dire.

16             MR. CLARK:  Thank you, Judge.

17                   **VOIR DIRE EXAMINATION**

18   Q.   (BY MR. CLARK):  Good afternoon, Agent.  My

19   name is Dean Clark and I represent Mario Reynoso.

20   A.    Good afternoon.

21   Q.    The Government is asking you about a number of

22   exhibits, the recordings and the transcripts from those

23   recordings.  And what I would like to ask is, can you

24   testify that the recording system used to record those I'm

25   going to call the "jail calls" was recording normally?

1          THE COURT:  Mr. Clark, I don't think there are

2    any jail calls mentioned among the proffered exhibits.

3          MR. CLARK:  Okay, Judge.  I'll focus, then, just

4    on the ones that are before us.

5    Q.   (BY MR. CLARK):  Can you testify whether any of

6    these recording devices were working as they should

7    have been?

8    A.   Regarding the calls that I have made?

9    Q.   The exhibits that the Government just wanted to

10   introduce?

11   A.   Yes.

12   Q.   I'll retrieve the exhibits out of the book.

13          (Discussion off the record.)

14          Okay.  Exhibits 2 through 10, which I believe are

15   in front of you?

16   A.   Correct.

17   Q.   Okay.  What kind of system was used to make those

18   recordings?

19   A.   An investigative system that we have.

20   Q.   Okay.  Can you be a little more specific?

21   A.   That's the investigative system pretty much records

22   all calls in and out of -- that are being made to a target's

23   phone number.

24   Q.   Okay.  What is the name of the system?

25   A.   The name is -- it's an investigative -- it's an

1    investigative tool that we use, that we pay for.

2    Q.   Okay.  I understand it's an investigative tool, but

3    what is the name of the specific system, the recording

4    system?

5    A.   I don't think I can -- I'm divulged [sic] to provide

6    that information.  Again, you would have to call the company

7    that works for that investigative branch.  I can't provide

8    that information.  We're not allowed to.

9    Q.   Okay.  Have you been trained to operate that system?

10   A.   Yes, we have.

11   Q.   And is it by this company that will not allow you to

12   divulge the name of the system?

13   A.   Correct.

14   Q.   Do you know if the system -- what kind of tests did

15   you run to make sure that the system was working correctly

16   on the dates of these exhibits?

17   A.   Well, as soon as the first calls are made, I go and I

18   log into the system to make sure that they're being

19   recorded.

20   Q.   Okay.  Is that it?  Nothing else?

21   A.   That's it, because of the -- one of the main purposes

22   is we want to make sure that all calls that are being made

23   between the defendant and between the undercover are being

24   recorded.  So that was one of the main focuses as an

25   undercover is to make sure that evidence is preserved and

1    not being lost.

2    Q.   Can you testify whether or not this system made any

3    minor or even major changes or if there were any

4    deficiencies, at all, in any of these recordings?

5    A.   There is no deficiencies in the recordings because I

6    went through each call and these are the exact calls that I

7    made and that were received by me.

8    Q.   Well, let's talk about the voice in these recordings.

9    Have you ever had seen -- let me back up.   Had you ever seen

10   Mario Reynoso before May 8th?

11   A.   Before May 8th, no.

12   Q.   So you have no firsthand knowledge of what Mario

13   Reynoso looked like, correct?

14   A.   Correct.

15   Q.   So then it's a true statement that you don't know for

16   sure if it was this Mario Reynoso who you were talking to on

17   those phone calls?

18   A.   I didn't know that until May the 8th.

19   Q.   Okay.   So and you're basing that on the interaction at

20   Sunland Park?

21   A.   Correct.

22             MR. CLARK:   Your Honor, I'm going to pass the

23   witness, but I would like to present argument on the -- I'm

24   going to abstain -- I'm going to continue my initial

25   objection on 901.   An unknown system that the Government

1    uses is not enough to lay a proper foundation that this

2    machine that we don't know about or this system that we

3    don't know about was working properly.  I understand the

4    agent's testimony, but I think we have a right to that

5    information and I do think it's a required part of the

6    foundation, Judge, so I'm going to object on those grounds.

7              THE COURT:  Show me where it's a required part.

8              MR. CLARK:  Your Honor, I can produce case law,

9    if you would like.  Now, I understand that the Government --

10   we know there's a little flexibility here, but there are

11   cases that go both ways.  I was looking at an Eighth Circuit

12   case.  I know it's not binding on this Court.  It would take

13   me a minute to get you a case.  If the Court wants to

14   withhold, I can certainly research that while we're moving

15   onto other things, but I think that it's just -- it's not

16   more than a weight versus admissibility.  I believe this is

17   admissibility, Judge, because the agent really -- I

18   understand his testimony, but he can't tell us much about

19   this.  And I think, because he can't tell us, he can't tell

20   us if it was working properly, if it did everything it was

21   supposed to be doing, the maintenance and things like that.

22             THE COURT:  I'm going to overrule the objection.

23   This witness, who was one of the participants in those

24   calls, has said he reviewed the transcripts and that they

25   accurately reflected those calls.  And that's

 1   authentication, I think, sufficient as it relates to the

 2   reliability of the recording instrument.

 3             Ms. Camacho?

 4             MR. CLARK:  Thank you, Judge.

 5             MS. CAMACHO:  With that understanding, then, Your

 6   Honor, Government's Exhibits 1 through 10 -- I'm sorry,

 7   2 through 10 and 2(a) through 9(a) are admitted?

 8             THE COURT:  They are.

 9   (Government's Exhibits 2-10 and 2(a)-9(a) were admitted into

10   evidence.)

11             MS. CAMACHO:  And Your Honor, I would request

12   permission to hand out notebooks that have the transcription

13   to the jury?

14             THE COURT:  Any objection?

15             MR. CLARK:  No, Your Honor.

16             THE COURT:  Please hand out the notebooks.

17             Do you have one for me as well?

18             MS. CAMACHO:  They're in the notebook that I gave

19   you, Your Honor.

20                   (Discussion off the record.)

21                   **DIRECT EXAMINATION (Continued)**

22    Q.  (BY MS. CAMACHO):  I'd like to turn first to

23   Government's Exhibit 10, which is the text messages.

24   And in that exhibit, Agent, there's various lines of

25   text messages interlineated with colored lines which

1    break them up.

2              So I'd like to start with just the very first

3    line, which -- of the text messages on the chart, which

4    indicates that it happened at 7:43 A.M. on May 3rd of 2018.

5    Was that the first communication you had with the defendant?

6    A.    Yes.

7    Q.    And can you read that text messages for me, please?

8    A.    (Reading) "Yo."

9    Q.    And was it incoming to you or outgoing?

10   A.    It was incoming to my phone.

11   Q.    So it was the defendant texting that to you?

12   A.    Yes.

13   Q.    And turning, then, to Exhibit 2, which are the calls,

14   so we're going to go back and forth with the texts and the

15   calls because they kind of intersperse, but if you could --

16   or tell me, first, what is Exhibit 2 and 2(a)?  I mean, what

17   are the time and date of the call?

18   A.    That was right after the text about 30 minutes, about

19   8:22 A.M.  That was the first phone call, actual phone call,

20   that I had with Mario.

21   Q.    And was it Mario Reynoso calling you or were you

22   calling him?

23   A.    He was calling me.

24   Q.    If you could play Exhibit 2, please.

25                        (Recording playing.)

1                    (Recording stopped.)

2                    Agent Lujan, what were you and the defendant

3    discussing in this call?

4    A.   It was pretty much we were trying to negotiate -- for

5    someone to negotiate the price of each ounce of meth

6    referred to it as "one," "two."  And in the call, pretty

7    much, he was asking me what price I bought it for before.

8    And I told him 500.  I told him if he would let me have each

9    for 400.  Now, if I bought three, he would give me a

10   discount of $100, so he let me have them for $1,100, so we

11   were talking about an ounce of meth.

12   Q.   So the "two" and the "three," we're talking about 2 or

13   3 ounces of meth?

14   A.   That's correct.

15   Q.   And at the beginning of that call, either he mentions

16   or you say that your name is Jesus.  Is that your true name?

17   A.   No.

18   Q.   Why did you tell him your name was Jesus?

19   A.   We don't tend to use our real name for undercover, our

20   persona.

21   Q.   For safety reasons?

22   A.   Yes.

23   Q.   And when he tells you, "This is Mario, Erica's

24   friend," what importance does that have to you?

25   A.   That's how we were that provided the information

1    that -- the information that we were given was the

2    individual that was selling was Mario and he was linked to

3    an individual by the name of Erica.

4    Q.   How do you know that it was methamphetamine that you

5    were talking about in this case -- in this call, sorry,

6    rather than cocaine or heroin or something like that?

7    A.   Well, because as soon as the case agent gave me the

8    contact information, he was specific on what the -- this

9    individual was selling.  He was selling meth.  It wasn't

10   cocaine, it wasn't heroin, mushrooms.  It was specific that

11   this individual was selling meth.

12   Q.   During this call, you use a fairly foul language.  You

13   use the "F" word several times.  Why is that?

14   A.   Well, you want to make it sound believable.  You want

15   to make it sound that the stuff that he has and the price

16   he's giving you is of top quality and you're excited about

17   it.

18   Q.   Are you playing a part?

19   A.   I'm playing the part.

20   Q.   At one point the defendant used the word "fire" to

21   describe the methamphetamine.  What did that refer to?

22   A.   Pretty much he's referring to that the quality is

23   great, that it's going to do some good -- some good -- or

24   that the fix, you're going to get a good fix out of it.

25   Q.   You mentioned during the call that you were two and a

1   half hours away.  You actually work in El Paso, correct?

2   A.   Correct.

3   Q.   Why do you -- why did you tell the defendant that you

4   were two and a half hours away?

5   A.   Well, I mean, usually, you want to try to buy time.

6   You know, sometimes you can't -- you let these individuals

7   that you're talking to know what they want to hear, but in

8   essence, you want to buy time because you just can't, from

9   one minute to the other, arrange a meet to meet with

10  somebody.  It takes time.  You have to coordinate with

11  teams.  You have to coordinate with the case agent.  You

12  need to buy time.

13  Q.   Do you have to do a fair amount of paperwork to get

14  the money and arrangements to do these purchases?

15  A.   When I've done it personally in the past, yes, it

16  takes a while.

17  Q.   Turning then to Exhibit 3, the next call, can you tell

18  me when that call was?

19  A.   This call was on the same day, May the 3rd, 2018, and

20  this was a little bit later in the afternoon, around 2:36 in

21  the afternoon.

22  Q.   If you could play Exhibit 3, please.

23                      (Recording playing.)

24                      (Recording stopped.)

25                  Agent, what was happening in this call?

1   A.   Pretty much, in this call, we pretty much let him know

2   that I wasn't going to be able to meet him that day, that I

3   was going to be out in the field working, so I wouldn't be

4   getting out till Monday.  So we kind of made an agreement to

5   meet on Tuesday, which is May the 8th.  And we both agreed

6   on it.

7   Q.   Was the purpose of this just what you testified about

8   before, just to build in some time to make the arrangements?

9   A.   That's correct.

10  Q.   And at one point, he says, "That's a lot of cop

11  questions."  What did you understood that made him nervous

12  about the possibility of you being a cop?

13  A.   I guess because I asked him, "What side of town do you

14  live in?"  And I mean, I'm not asking him for his address,

15  but just the mere fact that I asked him what side he lived

16  in struck me as this guy's very nervous.  So that's when he

17  threw out, "Those are a lot of cop questions."  I just

18  wanted to find out if he lived on the east side of El Paso.

19  I was going to let him know, "Hey, man, maybe you can get

20  closer to the west side because I'm coming from the New

21  Mexico side," but -- so we agreed that meeting in Las Cruces

22  wasn't an issue.

23  Q.   Turning then to Exhibit 4, can you tell me when that

24  call happened?

25  A.   This happened on Monday, May the 7th, 2018, around

1    8:23 in the evening.

2    Q.   If you could play Exhibit 4, please.

3                        (Recording playing.)

4                        (Recording stopped.)

5                 Agent, what was happening during this call?

6    A.   Pretty much, in this call, we agreed to meet the

7    following day around noontime at the Sunland Park casino to

8    do the exchange.

9    Q.   And the Sunland Park casino, is that located in New

10   Mexico or Texas?

11   A.   That's in New Mexico.

12   Q.   And do you know what county it's in?

13   A.   I do not know the county, no.

14   Q.   You're from Texas, right?

15   A.   That's correct.

16   Q.   Turning to Government's Exhibit 6, can you tell us

17   when that call happened?  Oh, I apologize.  Actually, let me

18   back up.  Government's Exhibit 5.

19   A.   This call was on May the 8th.  That's Thursday, May

20   the 8th, 2018, around 12:23 P.M.

21   Q.   Was this the date that you-all had agreed to meet?

22   A.   That's correct.

23   Q.   And if you could play Government's Exhibit 5, please.

24                        (Recording playing.)

25                        (Recording stopped.)

1           Agent, what was happening in this call?

2    A.   Pretty much, in this call, he called me to let me know

3    if I was going to come after all.  I told him, yeah, that I

4    was, that I'd probably be there in 15 or 20 minutes.

5    Q.   Turning then to Government's Exhibit 10, the text

6    messages, can you read Lines 2 and 3 of those text messages,

7    including the times at which they happened?

8    A.   On May the 8th, 2018, around 12:44, which is a little

9    bit after that call, I sent him a text (reading)*, "Ya, estoy*

10   *aqui esperando."*

11   Q.   And if you could just say it in English?

12   A.   "I am already here, waiting for you."

13           After that, around 12:51, Reynoso replies,

14   "Where, exactly, are you?"

15   Q.   Turning, after that, to Government's Exhibit 6, can

16   you tell me, what time did that call happen in relation to

17   those text messages?

18   A.   This call happened around four minutes after that last

19   text.  This happened around 12:55 P.M.

20   Q.   If you could play that call, please.

21                     (Recording playing.)

22                     (Recording stopped.)

23           Agent, can you tell me what was happening in this

24   call?

25   A.   Pretty much he called me to ask me where I'm at.  I

1    told him at the Sunland Park casino.  He asked if I'm

2    inside.  I told him, no, that I'm outside.  He asked if I

3    was in a big rig.  I told him, no, I was just in a regular

4    truck.  He told me to give him a little time for me to get

5    there.

6    Q.    And were you, in fact, in the parking lot of the

7    Sunland Park casino at this time?

8    A.    Yes.

9    Q.    Turning back to Exhibit 10, the text messages, can you

10   read the fourth and fifth lines of that text messages,

11   including the times at which they were sent?

12   A.    This was sent on May the 8th, 2018, same time -- or

13   same day, at 1:15 P.M.  I texted him (reading), "Almost?"

14              He replies, a minute later, at 1:16, "Yes, 20

15   minutes."

16   Q.    So you're still waiting for him at this point?

17   A.    Yes.

18   Q.    Turning then to Government's Exhibit 7, can you tell

19   me when that call happened?

20   A.    This happened, I would say, a minute or approximately

21   a minute after that last text.  This happened at 1:17 P.M.

22   Q.    If you could play Exhibit 7, please.

23              (Recording playing.)

24              (Recording stopped.)

25              Agent, turning back, then, to the text messages,

1    if you could look at the sixth through the eighth lines of

2    texts and read that to the jury, including the times.

3    A.    This was same day, May the 8th, 2018, at 1:49 P.M.,  I

4    texted him (reading), "Everything all right?  It is a long

5    time already."

6              He replies, at 1:50 P.M. (reading), "Exiting

7    Sunland."  And then seconds after that, he replies again

8    (reading), "What truck are you in?"

9    Q.    So that last text was at 1:50 P.M.?

10   A.    That's correct.

11   Q.    Shortly after that, did the defendant arrive at the

12   casino parking lot?

13   A.    Yes, he did.

14   Q.    And you talked before about having sometimes being

15   provided with a picture of somebody before you meet with

16   them.  In this case, had you been provided with a picture of

17   the subject that you were to meet with?

18   A.    Yes, I was.

19   Q.    Had you studied that picture before going to the meet?

20   A.    Yes.

21   Q.    So following this call, tell me what happens?

22   A.    Following this call, I think a few minutes later,

23   he -- I see a gray four-door Ford Fusion approaching.  So I

24   am actually parked facing the casino.  And he approaches and

25   he's parked opposite of me, I would say around 15 feet from

68

1    where I'm at.  As soon as I get out of the truck, I make

2    contact with him at the door.  And as soon as --

3    Q.   You're saying "him," who are you talking about?

4    A.   As soon as I make contact with the driver, I notice

5    that he is the same individual from the picture who is the

6    defendant seated at the -- on the right side here.

7              At that point, I made positive identification.

8    The first thing I notice is he's very nervous.  He's looking

9    all over the place.  He's telling me to get inside the car.

10   So I get into the back seat of the car, behind the driver's

11   seat.  When I get in, he tells me to close the door.  After

12   he tells me to close the door, I tell him where the meth is

13   at, and he points at a Band-Aid box in the center console.

14   So as I'm looking at the Band-Aid box, I get it, I pull out

15   a plastic bag that contained, from my training and

16   experience, crystal meth.  It looked around 2 ounces of

17   product.

18             During this time, he is turning around, he's

19   looking at me, he's looking all around.  He's looking to the

20   front, looking to the sides.  I gave him the money.  I gave

21   him $800.  I tell him to count the money, and he declines to

22   do so, tells me that he needs to leave.

23             During this time, I try to engage him.  My job is

24   to engage him in conversation because I'm trying to get the

25   case going forward.  I want to get as much evidence as I

1    can.  So as I'm doing that, I'm trying to engage him in

2    conversation, he tells me to call him later, that he needs

3    to leave.  So at that point, I knew that he was real

4    nervous.

5              During this time frame, I noticed that he --

6    there was a female seated in the passenger seat.  She was a

7    thin-framed female.  I noticed that as soon as she -- that I

8    got in the car, the first thing that she did was lower the

9    visor.  When she lowers the visor, all of her attention was

10   on the little mirror in the visor, so that's where all her

11   attention was focused when I was talking to the defendant.

12   Q.   Were you able to identify or see facial features of

13   that female?

14   A.   No.

15   Q.   Did you speak with her at all?

16   A.   No.

17   Q.   Did you have any interaction with her?

18   A.   No.  Other than she was in the vehicle, but that was

19   it.

20   Q.   As for the defendant, how -- he was sitting in the

21   passenger seat -- or I'm sorry, the driver's seat the whole

22   time?

23   A.   He was driving the car, yes.

24   Q.   So when you got in the back, can you tell me how the

25   body postures were in terms of how much you could see of him

1    and how you-all were communicating?

2    A.   Yeah, well, when I get in the back, I have a tendency

3    to kind of get more in the middle, so I can engage him

4    better.  It's just a pattern that I've picked up during the

5    years, so I could engage the individual a lot better.  So I

6    got kind of toward the middle.  He was seated in this

7    position on the right, so I was actually here on the side.

8    So he would turn around, he would talk to me this way.  And

9    then he would turn around and he would be looking to the

10   sides when we were -- during the meet.

11   Q.   Were you able to determine whether the defendant had

12   any identifying marks?

13   A.   He had multiple tattoos on both arms.

14              MR. CLARK:  What number, Counsel?

15              MS. CAMACHO:  35.

16   Q.   (BY MS. CAMACHO):  I've handed you what's been

17   marked as Government's Exhibit 35.  Have you looked

18   at that before coming to court today?

19   A.   Yes.

20   Q.   And what is that a picture of?

21   A.   A picture of the tattoos that the defendant has.

22   Q.   And looking at those tattoos, are they consistent with

23   what you observed in person that day on the defendant?

24   A.   Yes.

25              MS. CAMACHO:  Your Honor, I would move the

1   admission of Government's Exhibit 35.

2             THE COURT:  Any objection?

3             MR. CLARK:  No, Your Honor.

4             THE COURT:  35 is admitted.

5   (Government's Exhibit 35 was admitted into evidence.)

6   Q.   (BY MS. CAMACHO):  Sorry, I should have handed

7   you this as well.

8   A.   That's all right.

9   Q.   I've also handed you what's been marked as

10  Government's Exhibit Number 12.  Can you tell me what that

11  is?

12  A.   This appears to be the Band-Aid box that contained the

13  meth.

14  Q.   And is that a true and accurate representation of that

15  Band-Aid box as you saw it that day?

16  A.   Yes.

17            MS. CAMACHO:  I would move the admission of

18  Government's Exhibit 12 as well.

19            MR. CLARK:  No objection.

20            THE COURT:  12 is admitted.

21  (Government's Exhibit 12 was admitted into evidence.)

22            MS. CAMACHO:  And if we could put 12 up on the

23  screen.

24  Q.   (BY MS. CAMACHO):  When you took that Band-Aid

25  box from the defendant, did you open it there in the

1    car?

2    A.   Yes, I did.

3    Q.   And what could you see inside of it?

4    A.   I actually pulled out a baggie.  It was like a clear

5    plastic bag.  And when I pulled it out, I noticed that they

6    had large chunks of crystal meth.

7    Q.   And after the transaction, did you -- what did you do

8    with that Band-Aid box with the meth in it?

9    A.   Well, after he left, I left -- I departed the area,

10   met with one of the agents that's assigned with the case,

11   the case agent, and I handed him the evidence.

12   Q.   Was that the last involvement you had with the

13   physical evidence?

14   A.   That's correct.

15   Q.   And if we could see Government's Exhibit 35.  I showed

16   it to the agent, but I forgot to publish it to the jury.  So

17   you testified that these tattoos are consistent with what

18   you observed on the defendant that day?

19   A.   Yes.

20   Q.   And you can remove that.

21        With your many years of experience and the time

22   that you spent talking to the defendant that day, observing

23   him, having seen the picture beforehand, is there any doubt

24   in your mind that the person that you dealt with -- or who

25   the person that you dealt with that day is?

1    A.   No, there's no doubt.

2    Q.   And do you see that person in the courtroom here

3    today?

4    A.   Yes.

5    Q.   Could you point him out and describe what he's

6    wearing?

7    A.   He is seated next to the defense attorney.  He's got a

8    blue long-sleeved shirt and a blue tie.

9              MS. CAMACHO:  And Your Honor --

10   A.   And just so to be on the same page, he doesn't look as

11   thin as he did when I met with him.  He's gained a little

12   bit of weight.

13             MS. CAMACHO:  Your Honor, I would ask that the

14   record reflect that the agent has correctly identified the

15   defendant.

16             THE COURT:  He has.

17   Q.   (BY MS. CAMACHO):  So you testified that after

18   you left the location, you turned over the evidence

19   to Agent Ortiz, I believe?

20   A.   That's correct.

21   Q.   And did you have further communications with the

22   defendant --

23   A.   Yes --

24   Q.   -- after that?

25   A.   -- yes, I did.

1    Q.    And if you could turn back to Exhibit Number 10,

2    looking specifically at Lines 9, 10, and 11 on those text

3    messages, if you could read those, including the time at

4    which they were sent?

5    A.    Again, this is the same day, May the 8th, 2018,

6    2:04 P.M.  I texted him (reading), "Everything is fine,

7    bro'.  Do not overheat it, everything calm here, *primo*,"

8    meaning "cousin."  Around nine minutes after that, I texted

9    him again, "The cheese looks good.  I will let you know."

10           And then, about a minute after that, he texted

11   me, "I'm okay."

12   Q.    And when you were saying "the cheese," what were you

13   referring to?

14   A.    The meth.

15   Q.    You sort of touched on this earlier, but is that

16   common, for drug traffickers to just use code or different

17   words to talk about drugs?

18   A.    Yes, it is.

19   Q.    And when the defendant texted you, "I'm okay," what

20   did you understand him to be saying?

21   A.    Because I wanted to text when I told him everything

22   was okay, told him not to -- when I texted him,

23   "Everything's fine, bro', do not overheat it, everything's

24   calm here," he pretty much was reassuring, "No, I'm okay.

25   I'm good."

1    Q.    I believe you may have talked about this, but what was

2    his demeanor during the actual meet with you?  Was he calm

3    or was he nervous?

4    A.    No, he was very nervous.

5    Q.    Is that common when you meet with somebody?

6    A.    That's pretty much 90 percent of the time.

7    Q.    So still in that same section of text messages on

8    Exhibit 10, but a little bit later on in the afternoon, can

9    you read -- talk about or read Lines 12 and 13 of those text

10   messages?

11   A.    So I texted him again same day.  May the 8th, at

12   3:03 P.M., I texted him (reading), "Call me.  This bag is

13   short on grams.  What up?"  And then I texted him again,

14   milliseconds after that, I put, "Your money wasn't short,

15   was it?"

16   Q.    What had happened that led you to send these text

17   messages?

18   A.    I got a call from Agent Ortiz to let me know that the

19   weight of the meth was 48.7 grams.  So I already know that

20   an ounce carries 28 grams, so technically I should have

21   collected 56 grams worth of meth.

22   Q.    So it should have been 56.  And I'm sorry, say how

23   much it was again?

24   A.    It was 48.7.

25   Q.    Is that -- why is it important to you, as an

1     undercover, to sort of call the defendant out on that?

2     A.    Well, first of all, on a personal level, whether it's

3     undercover or as myself, I don't like to get cheated or

4     ripped.  And in this case, it was obvious that the amount

5     was short, so I needed to make it a point that, "Hey,

6     listen, you're not just selling to anybody, you're shorting

7     me out.  How are we going to fix this?"

8     Q.    Turning then to Government's Exhibit 8, can you tell

9     me at what time that happens in reference to the calls or to

10    the text messages that you just discussed?

11    A.    Uh-huh.  So after that last text, at 3:03, this one

12    happened six minutes later at 3:09 P.M. on the same day.

13    Q.    If you could play Exhibit 8, please.

14                      (Recording playing.)

15                      (Recording stopped.)

16            What was going on in this conversation, Agent?

17    A.    Pretty much, in this conversation, we were going back

18    and forth about the amount that was short.  He explained it

19    to me, that that's not the way he sells his ounces, that his

20    ounces are sold at 25; that's the way he gets them; if I

21    want the actual 28 grams per ounce, the price is going to be

22    a little bit higher.

23    Q.    And you actually mentioned the word or the term,

24    "Mexican ounce," which he agrees with.  What is a "Mexican

25    ounce"?

1   A.   It's a street term that's used in the drug trafficking

2   world when you're dealing with drug traffickers or as an

3   undercover, but that basically refers only -- only to black

4   tar heroin.  They tend to sell the heroin in 25 grams, so

5   instead of calling it an actual "ounce," they call it a

6   "Mexican ounce," because it's a little shorter than the

7   regular quality or quantity than an actual ounce of

8   28 grams.

9   Q.   And you said it's only used with heroin.  In your

10  years of undercover experience, have you ever seen anyone

11  selling methamphetamine as a Mexican ounce, as a 25-gram

12  ounce?

13  A.   No.  And that was one of the reasons when he kept

14  reiterating that that's how he sold them, that's when I made

15  reference, "You guys are selling Mexican ounces," even

16  though I know it's only sold in heroin, but he agreed right

17  away.

18  Q.   If these were supposed to be Mexican ounces, 25-gram

19  ounces, were they complete 25-gram ounces or was it short

20  even for that?

21  A.   No, we were still short about 1.3.  And during the

22  calls, I kind of -- he was telling me that it was short .2

23  so I told him, toward the end, that they weighed 48.7, so he

24  pretty much said, "Okay, I owe you a gram."  So instead of

25  getting into a further discussion because that call got

1    pretty intense and then it calmed down, so I went ahead and
2    said, "Okay, you owe me a gram."
3    Q.    Was that a net weight with the lab or was that just
4    the weight with the baggie?
5    A.    I assume that's probably the weight with the whole
6    baggie.
7    Q.    And that call happened still on May 8th.  Did you have
8    further contact with the defendant after this?
9    A.    Yes.
10   Q.    And turning to Government's Exhibit 10, can you read
11   the last text message, Line 14, on that and tell us when,
12   what day and date that happened on -- or what date and time?
13   A.    When I texted him on May the 25th, 2018, at around
14   7:21 P.M.  Just texted him (reading), "Wuz up, Mario?"
15   Q.    Did he reply to you?
16   A.    He replied about 20 -- approximately 20 minutes later,
17   around 7:42, he replied, "Yo, what's up?"
18   Q.    And then I said Line 14, but continue reading that
19   section, Lines 16 and 17 then?
20   A.    So around 9:06 P.M., I texted him (reading), "I just
21   got to work, don't get out till Tuesday, going to need some
22   more -- going to need some cheese from you."  Again I texted
23   him at 10:01 P.M., "call you on Tuesday so we can work out a
24   number for 11."
25   Q.    And then turning to Government's Exhibit 6 -- I'm

1    sorry, Government's Exhibit 9, can you tell me when that

2    call happened between you and the defendant?

3    A.    So this happened on June the 6th, 2018, at around

4    2:35 P.M.

5    Q.    And during this time period, since May 8th, had you

6    had any in-person contact with the defendant or was it just

7    these texts and calls we're talking about?

8    A.    Just texts and calls.

9    Q.    So if you would play Government's Exhibit 9, please.

10                    (Recording playing.)

11                    (Recording stopped.)

12             What was happening during this call, Agent?

13    A.    The purpose of this call, we were trying to establish

14    a second meth buy.  So I was calling him to let him know

15    that I was going to be in town the following day.  And I

16    told him that I had 2,200.  So how much he would let me have

17    for -- or I mean, how many he would give to me for 2,200.

18    He said, six, that he would give me six, possibly an extra

19    one, but he didn't know until he met with his boy.

20    Q.    When you were talking about "six," six what?

21    A.    6 ounces of meth.  Because, again, he was letting me

22    have 3 ounces of meth for 1,100.  So I kind of threw the

23    number out there to see if he would say six.  So yeah, he

24    said 6 ounces of meth.  At that point, we pretty much talked

25    about the location.  I told him that can do it at Sunland

1    Park because that's where my boy has his truck.  He was

2    telling me that he can pick me up and take me to somewhere

3    else because he said that, apparently, he only had three at

4    that point and he didn't know if he was going to have them

5    the following day.

6    Q.   Did that transaction ever happen the following day?

7    A.   No.

8    Q.   And turning finally back to Government's Exhibit 10,

9    can you read the last line, 18, the last text message?

10   A.   June 14th, 2018, and this was at 5:17 P.M.  I texted

11   him (reading), "What's up, Mario?  You are ignoring me.  You

12   remember that you owe me 1 gram?  Call me, please, to make

13   purchase and collect what you owe me."

14   Q.   Agent Lujan, did that text message end your

15   involvement with the defendant and with this case?

16   A.   Yes.

17             MS. CAMACHO:  I'll pass the witness, Your Honor.

18                        **CROSS-EXAMINATION**

19   Q.   (BY MR. CLARK):  Good afternoon, again.

20   A.   Good afternoon.

21   Q.   What I would like to do is kind of go back to the

22   beginning of the Government's direct and flesh out some of

23   your initial training.  Earlier, you stated, I think, you

24   started out with the El Paso Police Department; is that

25   correct?

1    A.    That's correct.

2    Q.    And did you do the law enforcement academy there in

3    the mountain, in El Paso?

4    A.    Yes, sir.

5    Q.    How long was that academy?

6    A.    It was six months.

7    Q.    And you were certified as Texas law enforcement after

8    that?

9    A.    Yes, sir.

10   Q.    And how long did you work for El Paso Police

11   Department?

12   A.    From 1997 to 2007.

13   Q.    And then you went to work for HSI.  And you did

14   another six months of training, correct?

15   A.    That's correct.

16   Q.    And let's talk about, in both of those initial blocks

17   of training, you are trained, as an investigator, that you

18   want to avoid personal bias when you're conducting an

19   investigation, correct?

20   A.    That's correct.

21   Q.    And you are trained that you want to be as objective

22   as possible, correct?

23   A.    Correct.

24   Q.    And for simplicity, what I'd like to do is just kind

25   of agree that an objective investigation is one without

1   bias.  Can we agree to that loosely?  It's not a Webster's,

2   but would you agree that that's what we're getting at here?

3   A.   Yes.

4   Q.   And the idea is that you want to avoid bias because it

5   leads to preconceived ideas and that could affect the

6   outcome of your investigation, correct?

7   A.   That's correct.

8   Q.   And you would agree that bias is something that you

9   have to work very hard to eliminate in your investigations,

10  correct?

11  A.   What do you mean "work very hard"?

12  Q.   Well, you want to make sure, Agent, you're doing your

13  best to avoid any sort of preconceived ideas that are going

14  to shape how you investigate that matter?

15  A.   Correct.

16  Q.   And you also probably in both -- I'm going to call it

17  "initial training" in both of your academies, if you will,

18  were you trained in eyewitness identifications?

19  A.   Yes.

20  Q.   And I believe, earlier, you had mentioned there are a

21  number of ways of identifying individuals, correct?

22  A.   Correct.

23  Q.   And you used the words "they can be pre-identified"?

24  Do you remember that testimony?

25  A.   Yes.

1    Q.    And that's what happened in this case, correct?

2    A.    I'm sorry, I don't get your question.

3    Q.    Okay.  In this case, agents identified who they

4    thought the defendant was by showing you a photograph,

5    correct?

6    A.    That's correct.

7    Q.    So that would be an example of pre-identifying a

8    suspect, correct?

9    A.    If you call it that, yes.

10   Q.    Okay.  Well, let me clear that up, then, because you'd

11   mentioned, I think the word was "pre-identified."  You used

12   it earlier.  What did you mean by that?

13   A.    By that, I mean, we already had an identification of a

14   possible target.

15   Q.    Okay.  So "we" meaning the police-team concept...

16   A.    Correct.

17   Q.    ...have identified the --

18   A.    Yeah, myself, the case agent, co-case agents, and the

19   team.

20   Q.    Well, then, if you will, please tell me exactly what

21   was it that you were shown from the other agents to identify

22   the target?

23   A.    It was a facial picture of the defendant.  And we were

24   given pictures of multiple tattoos.

25   Q.    How long ago -- or I'm sorry, how long before the

1   May 8th exchange at Sunland Park were you shown these

2   pictures and -- well, the pictures?

3   A.   I was shown those pictures on May 8th, during the

4   course of the briefing.  I think we briefed around 10:30 in

5   the morning.  So it was a few hours before I met with the

6   defendant.

7   Q.   So the very same day was the first time you'd ever had

8   any photographic information identifying Mr. Reynoso?

9   A.   Yes.

10  Q.   And I believe you might have even used the words you

11  "studied" those photos?  Did you say that earlier?  You

12  studied the photos?

13  A.   I looked at a photo.

14  Q.   How long did you look at those photos?

15  A.   Well, enough to get a visual picture in my brain, in

16  my mind; that way, I can store it up here and use it when I

17  see the defendant.

18  Q.   Okay.  So in your mind, you got a photograph of --

19  it's already there, right?  That's what you're looking for?

20  A.   Correct.

21  Q.   That's the person you're looking for, you've already

22  reached that conclusion, correct?

23  A.   Well, that's the person that could possibly be it,

24  yes.

25  Q.   But my point is -- and I like the way you said it --

1    in your mind, that picture is there, correct?

2    A.   It's possibly, yes.

3    Q.   Okay.  You also mentioned, Agent, and if I don't get

4    it exactly right, please correct me or the counsel or Judge

5    will, but you used the term "misidentification."  Do you

6    remember talking a little bit about that?

7    A.   I think I talked about having pictures of people in

8    briefings and then we meet them and it's not the same

9    person.

10   Q.   Okay.  And I think you're right.  That's what I

11   recall.  But let's talk about misidentification.  That was a

12   term that you used.  In your decades-plus of experience,

13   you've had cases where there was a misidentification,

14   correct?

15   A.   That's correct.

16   Q.   Because you would agree, eyewitness identification is

17   not always accurate, is it?

18   A.   That's true.

19   Q.   There are instances where someone was at the scene of

20   the crime and...misidentify, right?

21   A.   Yes.

22          MR. CLARK:  Just one moment, Your Honor.

23   Q.   Now, when we talk about a misidentification and, based

24   on your experiences, there are a number of factors that

25   would contribute to misidentifying somebody, correct?

1    A.   Yes.

2    Q.   I mean, it could be almost unlimited, wouldn't you

3    agree, the number of factors?

4    A.   Yeah, yes.

5    Q.   Time of day.  If it's in the middle of the night,

6    somebody might be groggy, that could contribute, correct?

7    A.   Well, actually, what I'm -- me, I'm thinking factors

8    as in the facial recognition is totally different, the

9    height, the weight is totally different, that's the -- or I

10   mean, I guess I'm not understanding your question.

11   Q.   Okay.  Well, let me go back to, then, just some of

12   your experiences.  When we talk about, you know, someone

13   identifies the wrong target...

14   A.   Right.

15   Q.   ...the person who is incorrect, who makes the wrong

16   identification, there are a number of things that factor or

17   that could contribute to that false identification, correct?

18            MS. CAMACHO:  Objection, Your Honor.  He's asking

19   him generalities about what other people do rather than

20   about his work and his experience.

21            MR. CLARK:  I can focus to his experience, Your

22   Honor, because I can then narrow it down to this case.

23            THE COURT:  Let's do that.

24   Q.   (BY MR. CLARK):  In your -- I'm sorry.  How

25   many years have you -- 1997, so 22 years now?

1    A.    Yes, sir.

2    Q.    Twenty-two years as an agent, have you dealt with a

3    witness be it law enforcement or civilian who has

4    misidentified a suspect?

5    A.    Personally, myself, no.  I've seen it happen with

6    other detectives when I was in the police department, but as

7    far as me having personal experience with a witness that

8    misidentified, I haven't had that experience.

9    Q.    Okay.  But other agents have -- or strike that.

10          When you mention other agents or detectives in

11   El Paso, were you a part of that investigation?

12   A.    No, sir.

13   Q.    So you just heard through the grapevine somebody else

14   had a problem?

15   A.    Right.

16   Q.    Okay.  But I want to summarize in -- but we can agree

17   that misidentification does happen?

18   A.    Can happen, yes.

19   Q.    Well, let's talk about the facts of this case, then.

20   You were wearing sunglasses that day, weren't you?

21   A.    Yes.

22   Q.    And when Mr. -- or the gray car pulled up, you

23   approached and, within seconds, a second or two, maybe, you

24   were in the back seat, correct?

25   A.    No, a little longer than that.

1    Q.   A few seconds, five seconds, maybe ten?

2    A.    No.  I initially made contact with them via the

3    driver's door.  I was outside and I made contact with him,

4    so I started talking to him regarding whatever we talked

5    about.  And immediately, he told me, "Get in the car."  So I

6    engaged him, I would say, I would guess, a good 10,

7    15 seconds.

8    Q.   So 10 to 15 seconds, I'm not going to hold you to it

9    but more or less 10 to 15 seconds, correct?

10   A.   Correct.

11   Q.   You're wearing sunglasses, correct?

12   A.   That's correct.

13   Q.   The windows were tinted?

14   A.   No, he had the window rolled down.

15   Q.   I understand that, but the windows were tinted, right?

16   A.   I don't know.  The window was rolled down.  I don't

17   think I understand the -- I don't know if the window was

18   tinted or not.  It was rolled down.

19   Q.   Let me back up then.  Did you -- were you shown

20   pictures of the car ahead of time?

21   A.   No.

22   Q.   Were you told what -- given a description of the car

23   ahead of time?

24   A.   No.

25   Q.   So you had no information, at all, about the car that

1    was going to be coming up?

2    A.   That's correct.

3    Q.   When you -- when the car pulls up, you were there for

4    more or less 10 to 15 seconds.  Did you notice any of the

5    other windows being tinted?

6    A.   No, I did not.

7    Q.   Okay.  So roughly after this 10 to 15 seconds, you get

8    in the back seat.  And then you testified earlier that

9    that's when you purchased the drugs, correct?

10   A.   That's correct.

11   Q.   And would it be fair to say that during most of this

12   transaction, you're looking at the back of the driver's head

13   and perhaps the back of the passenger's head?

14   A.   It happened on and off.  Initially, when I got into

15   the back seat, he made contact with me again.  Then he broke

16   contact and he started looking all around.  So while I was

17   looking at the bag -- or at the box, the Band-Aid box,

18   looking at the stuff, he was looking all the way around.

19   When I gave him the money, again, he engaged me and made

20   contact with me again.  I gave him the money and I asked him

21   to count it.  And then that's when he said that he would

22   count it later.

23   Q.   I understand that and I appreciate that, but if you

24   had to break down or give us an estimate of how much time

25   in seconds, just like when you were at the door, when you

1   claim that the driver turned around to look at you or to

2   talk to you, how much total time did you have eye contact?

3   A.   Outside?  Around, like I said, 10 to 15 seconds.

4   Inside, I would say another 5, about another 10 seconds.  So

5   I would say about 30 seconds, about half a minute --

6   Q.   So --

7   A.   -- rough estimate.

8   Q.   -- we can agree, more or less, 30 seconds during the

9   entire transaction.  Correct?

10   A.   Correct.

11   Q.   Do you recall what the driver was wearing that day?

12   A.   No.  No, I do not.  My focus was specifically on

13   confirming that -- if it was the same guy.  My focus was on

14   his face, more than anything.  I did look at his arms, saw a

15   bunch of tattoos.  Can I tell you exactly what the tattoos

16   were?  Can't do that.  My attention was mainly on his facial

17   features.

18   Q.   That was the point I was going to bring.  The tattoos,

19   I think you used the word "consistent" to describe the

20   tattoos in the Government's photograph with what you saw

21   that day, correct?

22   A.   Correct.

23   Q.   But you cannot testify 100 percent certain that those

24   are the same tattoos, can you?

25   A.   No, I cannot.  Again, my attention and my focus was

1   making sure that he was the individual from the photo that

2   was provided to me.

3    Q.   And in fact, if you look at the exhibit, some of those

4   tattoos would have been pretty hard to see that day, don't

5   you think?  Do you have the exhibit in front of you?

6    A.   Yes.

7            MR. CLARK:  And can I ask, has that been

8   published to the jury?

9            MS. CAMACHO:  Yes.

10               (Discussion off the record.)

11   Q.  (BY MR. CLARK):  Okay.  You see the tattoos?

12   A.   Yes.

13   Q.   The ones on the left side of the face and on the left

14   side, if he's sitting in the car, it's going to be a little

15   tough to see those, isn't it?

16   A.   Well, again, I approached him to the left side on the

17   outside.  Again, I'll be honest with you, my -- they asked

18   me if I remembered that tattoo on his neck.  I do not

19   remember it.  Again, my focus was on his face.  When I went

20   into the car, again, the neck -- the tattoo on the neck

21   wasn't visible from the angle that I was sitting at, but the

22   ones on the arms, they were visible.

23   Q.   So we don't remember the neck one, but we do remember

24   there was something on the arms?

25   A.   Correct.

1    Q.   After you got into the car, you were focused on I want

2    to call "eye contact," right?  You wanted to get that facial

3    recognition; is that a fair statement?

4    A.   Yes.

5    Q.   You were engaged in this conversation and, at one

6    time, there's the Band-Aid box with the drugs in it.

7    That -- it's there, correct?

8    A.   Right.

9    Q.   And you seized it.  You picked it up and made it your

10   property, for intents -- or for the purposes of this

11   investigation, correct?

12   A.   For this investigation, I purchased it, yes.

13   Q.   I mean, we know you're not going to go home and use

14   it, but to carry out, we're going to call this a "rouse,"

15   you know, you're in character, and to carry out your

16   character, you're going to pick that up and you're going to

17   act like it's your purchase, it's your property now,

18   correct?

19   A.   Yeah, I bought it.  Yes, technically, after I buy

20   it -- we made an agreement to buy it, so yes, it belongs to

21   me.

22   Q.   Okay.  Now, you turn that over.  And other agents did

23   what they did with it.

24            Earlier, you'd mentioned that you're also trained

25   to deal with firearms; is that right?

1   A.   I'm sorry?

2   Q.   Earlier, I think, in your direct examination, you'd

3   mentioned some experience with firearms?  Or firearms cases?

4   A.   Oh, yes, correct.

5   Q.   Okay.

6   A.   Yes.

7   Q.   All right.  Then are you familiar with contact DNA?

8   A.   I've heard about it.

9   Q.   You've heard about it?

10   A.   Uh-huh.

11   Q.   Do you know if there was any sort of DNA, contact DNA

12   or otherwise, on either the Band-Aid box or the bag inside

13   of the box that belongs to the defendant (indicating)?

14   A.   Not that I know of.

15   Q.   Okay.  And you also know how fingerprints work,

16   correct?

17   A.   Correct.

18   Q.   Isn't it true there were no fingerprints on that box

19   or on the bag that belonged to my client?

20   A.   Again, I do not know if the box got examined for

21   fingerprints.  I do not know that.

22   Q.   Okay.  Fair enough.  And thank you for that.

23        Now, when we talked earlier, I used the term

24   "rouse" and you're in character.  We understand that -- I

25   think you said earlier you told him you were -- you told the

1    driver, whoever you were talking to that day, May 8th, that

2    you were about two and a half hours away.  Do you remember

3    that testimony?

4    A.    Yes.  I told the defendant, yes, or whoever I was

5    talking to, yes, I was two and a half hours away.

6    Q.    Okay.  And there are a number of other small things

7    that you may have said to continue this rouse, correct, that

8    weren't true?

9    A.    To continue what rouse?  The...

10   Q.    Let me back up.  That was a terrible question.  I'm

11   going to withdraw that.

12          When you were doing this investigation, you

13   wanted to convince the defendant or the driver that you're a

14   drug buyer, correct?

15   A.    That's correct.

16   Q.    And in order to do that, you made a number of

17   misrepresentations, correct?

18   A.    That's correct.

19   Q.    And in a way, that kind of goes back to your training

20   and the realities of how these cases work, correct?

21   A.    Well, that's my training as my undercover, undercover

22   training, yes.

23   Q.    Right.  You are trained to strategically misrepresent

24   because you want to catch the bad guys, right?

25   A.    Yes.

1    Q.   And you did that in this case, correct?

2    A.   Yes.

3         MR. CLARK:  Your Honor, could I have just one

4    moment, just one second, Judge?

5         THE COURT:  Yes, sir.

6            (Discussion off the record.)

7         MR. CLARK:  Thank you, Judge.

8    Q.   (BY MR. CLARK):  How much money did you provide

9    the driver that day?

10   A.   $800.

11   Q.   And do you know, was that -- let me back up.

12        When you do your -- many of these drug

13   transactions, do you mark or identify the money?

14   A.   Personally, me?  No.

15   Q.   But do the agencies mark that money when they give it

16   to you for a controlled buy?

17   A.   I don't think so, but I'm not accurate on that, but I

18   don't think so.

19   Q.   Let me -- let me -- maybe I'm using a bad word, we're

20   not talking about marking it like the old days, but have

21   your controlled buys -- isn't it true that you want to be

22   able to identify the money, so you can pull that money back

23   off the defendant later on?

24   A.   Well, in case -- again, if the case is specifically

25   directed to have a police unit pull over the individual as

1   soon as the buy is made, then I would say the money is

2   marked to make sure that the money they're recovering is the

3   same money, but in this case, we're going to just make the

4   buy and let him go, so I don't...

5   Q.   And you've answered my question.  I don't mean to cut

6   you off, but in this case, there's nothing that shows this

7   $800 ended up in the defendant's pocket, is there?

8   A.   Well, I gave him the $800, so if he put them in his

9   pocket, I don't know.

10  Q.   You got me.  There's nothing, Agent -- we don't have

11  that money to prove that it was pulled off this particular

12  person, do we (indicating)?

13  A.   Did we get the money back?  No, we did not.

14  Q.   You had also mentioned you didn't do that because, as

15  far as you know, there were other people looking at this

16  investigation and they just wanted to let him go; is that a

17  fair statement?

18  A.   No.  Actually, the purpose of letting him go after the

19  first buy is we were trying to establish a second meet to do

20  a bigger purchase.

21  Q.   So you start out small?

22  A.   Well, I would say 2 ounces, yeah, is small.  So we had

23  the intention of meeting him again and making a bigger

24  purchase.

25  Q.   But that never happened, did it?

1    A.   No, it did not.

2              MR. CLARK:  Your Honor, I'll pass the witness.

3              Thank you, Agent.

4              THE WITNESS:  Thank you.

5                    **REDIRECT EXAMINATION**

6    Q.   (BY MS. CAMACHO):  Agent Lujan, I just wanted

7    to clear up, Exhibit 35 which has the pictures of

8    the defendant's tattoos, is it your understanding

9    that that was -- those pictures were taken at the

10   time of the defendant's arrest in this case?

11   A.   This particular picture, yes.

12   Q.   So I believe that you testified that you were given

13   the picture of the tattoos prior to the meet.  Was that a

14   misstatement?

15   A.   Well, no, I'm sorry.  I wasn't given this picture

16   prior to the meet, first of all.  We were just informed that

17   this individual had tattoos --

18   Q.   Okay.

19   A.   -- but yes.

20   Q.   Okay.  I just wanted to clarify that for the record --

21   A.   Yes, yes.

22   Q.   -- you had a picture of his face prior to the meeting,

23   but not a picture of tattoos?

24   A.   That's correct.

25   Q.   And Agent, I failed to ask you before, but did you

1    have an audio recording of the meeting inside the car with

2    the defendant?

3    A.    I do not remember if I did or not.  Usually, we -- if

4    we do have a recording, we tend to connect it with the

5    actual same line, but I do not recall if there was one or

6    not.  I'm sorry.

7    Q.    That's okay.  So the defense counsel asked you a lot

8    of questions about misidentification and the idea that you

9    might have a preconceived notion of what the person's going

10   to look like.  Is your job to say that it is the same person

11   that you're meeting with from the picture or is it your job

12   to determine whether or not it's the same person?

13   A.    My job is to determine whether it's the same person or

14   not.

15   Q.    And you testified on cross-examination that you could

16   not testify with 100 percent certainty that the tattoos in

17   that picture in Exhibit 35 are the exact, same tattoos the

18   defendant had, which is understandable.  Can you testify

19   with 100 percent certainty that the person that sold you the

20   methamphetamine on May 8th is the defendant, Mario Reynoso?

21   A.    Yes, it is.

22   Q.    And finally, you were asked at the end about some

23   questions about whether you misrepresent yourself; fancy

24   word for "lie."  When you're an undercover agent, you're

25   telling lies to the person who is selling you dope about who

1    you are, correct?

2      A.    That's correct.

3      Q.    Would you ever misrepresent or lie about anything in

4    court?

5      A.    No.  I'm under oath.  I can't do that.  Can't do it

6    even as a patrol officer or as a regular agent, can't do

7    that.

8                  MS. CAMACHO:  Thank you.

9                  THE WITNESS:  Thank you.

10                 THE COURT:  Mr. Clark?

11                 MR. CLARK:  Your Honor, I have no follow-up.

12   Thank you.

13                 Thank you, Agent.

14                 THE WITNESS:  Thank you, sir.

15                 THE COURT:  May the witness be excused?

16                 MS. CAMACHO:  Yes, Your Honor.

17                 MR. CLARK:  Yes, Your Honor.

18                 THE COURT:  You're free to go on about your

19   business.  Thanks very much.

20                 THE WITNESS:  Thank you, Judge.

21                 THE COURT:  Watch your step as you go down there.

22                 This would be a great place to take our afternoon

23   break, folks.  We'll be 20 minutes.  We'll get back together

24   at 3:15.  Take a break, relax, have a soda or something, but

25   please don't think or talk about the case yet, all right?

1    We'll see you back here in a little bit.

2                    We'll all rise as you depart.

3                         (Jury not present.)

4                    3:15, Counsel.  Thank you.

5                    You'll have your next witness?

6                    MS. CAMACHO:  Yes.

7                         (A recess was taken.)

8                    THE COURT:  Thanks, everyone.  Let's bring the

9    jury back, please.

10                   Do you have your next witness ready, Ms. Camacho?

11                   MS. CAMACHO:  Yes.

12                   THE COURT:  You can come on up, sir.  Right up

13   here.

14                   Ms. Camacho, you've got some exhibits up here

15   still?

16                   MS. CAMACHO:  I think these are for this agent,

17   Your Honor.

18                        (Jury present.)

19                   THE COURT:  Thanks, everyone.  Take your seats,

20   please.  Welcome back, everybody.  We've got another witness

21   for you.

22                   Ms. Hammond?

23                   MS. HAMMOND:  Yes, Your Honor.

24                   THE COURT:  Who is your witness?

25                   MS. HAMMOND:  Agent Danny Ortiz.

1                        **DANIEL ORTIZ**,

2              After having been first duly sworn, did make the

3    following answers:

4                        **DIRECT EXAMINATION**

5              THE COURT:  Thank you.  Have a seat.

6    Q.   (BY MS. HAMMOND):  Please state your name for

7    the record.

8    A.   It's Daniel Ortiz.

9    Q.   And how are you employed?

10   A.   I'm a special agent with Homeland Security

11   Investigations.

12   Q.   How long have you worked for Homeland Security

13   Investigations, HSI?

14   A.   Approximately ten years now, just under ten years.

15   Q.   And can you describe what capacity in which you work

16   for HSI and what your duties are?

17   A.   Right now, I primarily work narcotics investigations.

18   Q.   How long have you been working on narcotics

19   investigations?

20   A.   For about five years now, I would say.

21   Q.   Were you working on May 8th, 2018?

22   A.   I was.

23   Q.   And where were you working that day?

24   A.   I was working in Sunland Park, New Mexico.

25   Q.   What were you working on?

1    A.    We were doing a buy/walk operation for 2 ounces of

2    methamphetamine.

3    Q.    Were you working with Agent Lujan on that day?

4    A.    Yes, I was.

5    Q.    And what was your role in the investigation?

6    A.    I was a surveillance, slash, cover agent.  So

7    basically we were providing surveillance and cover for the

8    undercover agent while he was meeting with the subject of

9    the investigation.

10   Q.    So when you say "cover," what do you mean by that?

11   A.    If something were to go wrong, we would go in and

12   extract the UC from any danger, should the need arise.

13   Q.    And you mentioned surveillance.  How did you provide

14   surveillance?

15   A.    On that particular day, I actually videotaped the

16   transaction as it took place.

17   Q.    I've placed in front of you a DVD that was previously

18   marked as Government's Exhibit 11.  Have you reviewed that

19   exhibit?

20   A.    Yes, I have.

21   Q.    And what is it?

22   A.    It's a copy of the video that was taken that day by

23   myself.

24   Q.    And is that video a fair and accurate depiction of

25   what you saw in Sunland Park that day?

1    A.   Yes, it is.

2    Q.   Were there any differences between what you saw and

3    what's on the video?

4    A.   No, there is not.

5         MS. HAMMOND:   Your Honor, I now move to admit the

6    video recording previously marked as Government's Exhibit 11

7    into evidence.

8              THE COURT:   Any objection?

9              MR. CLARK:   No objection, Your Honor.

10             THE COURT:   Thank you.   It's admitted.

11   (Government's Exhibit 11 was admitted into evidence.)

12             MS. HAMMOND:   Emily, can you play that video?

13                  (Recording playing.)

14             THE COURT:   Is everyone able to see it on the

15   screens?   Everyone good?

16                  (Recording stopped.)

17             MS. HAMMOND:   Thank you.

18   Q.   (BY MS. HAMMOND):   Agent Ortiz, that video

19   starts out focused on a gray truck and a man in a

20   blue T-shirt.   Can you identify who that man is?

21   A.   Yes, I can.   That's Special Agent Lujan.   He was the

22   undercover agent that day.   And the gray truck was the

23   vehicle he was utilizing to conduct the transaction.

24   Q.   And then you hear a voice come on and say the date.

25   Whose voice is that?

1    A.    That's actually my voice.

2    Q.    You hear other voices throughout the video.  Whose

3    voices are those?

4    A.    Some of the voices are from the transmitter that the

5    undercover agent is actually wearing, so we can hear what's

6    going on.  And the other communications that you hear were

7    the radio traffic on the regular car radios.

8    Q.    Watching the video, can you see through the windows of

9    the vehicle that's the focal point of most of that video?

10   A.    So in person, you really could, but as you're viewing

11   the video, it's kind of hard to depict that there is a

12   second individual inside the vehicle.  However, I couldn't

13   see clearly enough to actually make out who was actually in

14   the vehicle, but you could tell that it was occupied two

15   times, meaning that there were two people in the vehicle.

16   Q.    And that vehicle, at the end of the video, you focus

17   on the license plate, the rear of the vehicle.

18   A.    Yes, ma'am.

19   Q.    Do you know the license plate for that vehicle?

20   A.    Yes, it was Texas, and then I believe it was KNJ4185.

21   Q.    And do you know what type of vehicle that was?

22   A.    It was a gray Ford Fusion.

23   Q.    Beyond taking that video, did you assist Agent Lujan

24   in any other capacity that day?

25   A.    Yes.  Following the transaction, after it had been

105

1    completed and the individual had drove off, Mario Reynoso,

2    had droven [sic] off, we followed out Agent Lujan to a

3    neutral location.  At that point, I met with him and then I

4    took possession of the methamphetamine that he had

5    purchased.

6    Q.    What did you do with the methamphetamine once you took

7    custody of it?

8    A.    I placed it into an evidence bag, and then I

9    transported it to the HSI office in El Paso where it could

10   be processed.

11   Q.    I've set several photographs in front of you.  One of

12   them has already been admitted into evidence as Government's

13   Exhibit 12.  The other three were previously marked as

14   Government's Exhibits 13 through 16.  Have you reviewed

15   those photographs?

16   A.    Yes, I have.

17   Q.    And what are they?

18   A.    They're pictures of the methamphetamine which was

19   concealed inside of a Band-Aid box.  And that's the box with

20   the methamphetamine that I received from Agent Lujan.

21   Q.    And do those photographs accurately reflect what the

22   drugs looked like on that day when Agent Lujan gave them to

23   you?

24   A.    Yes, they do.

25             MS. HAMMOND:  Your Honor, I move to admit

1  Government's Exhibits 13 through 16 into evidence.

2             THE COURT:  Any objection?

3             MR. CLARK:  Your Honor, just an objection to

4  Exhibit 16.  If the Court would like, I can address that or

5  we can approach, but the name on that is not the name of my

6  client.

7             THE COURT:  I expect we'll cover that in

8  cross-examination.  13 through 16 are admitted.

9  (Government's Exhibits 13-16 were admitted into evidence.)

10  Q.  (BY MS. HAMMOND):  All right.  I'd like to

11  start with Exhibit 12.  Can we publish that?

12             Agent, can you explain what this is a photograph

13  of?

14  A.   It's a picture of a Band-Aid box that was used to

15  conceal the methamphetamine.

16  Q.   And moving on to Government's Exhibit 13, can you

17  please explain this photograph?

18  A.   So that's going to be a picture of opening the

19  Band-Aid box and you're able to see the methamphetamine

20  inside a plastic baggie.

21  Q.   Turning to Government's Exhibit 14.  Can you explain

22  this photograph.

23  A.   That's basically the methamphetamine outside of the

24  Band-Aid box, just placed on top of the box, showing where

25  it came from.

1    Q.   And now turning to Government's Exhibit 15.

2    A.   That's going to be a picture of the methamphetamine

3    based on the weight, placed on the scale, and it depicts the

4    weight of the methamphetamine.

5    Q.   Does the weight include the plastic bag?

6    A.   Yes, it does.

7    Q.   And how much does the meth in the bag weigh?

8    A.   48.7 grams.

9    Q.   Turning now to Government's Exhibit 16, what's

10   depicted in this photograph?

11   A.   That's the methamphetamine placed in a sealed evidence

12   bag where it's processed and left for safekeeping.

13   Q.   I see a lot of handwriting on this bag.  Whose

14   handwriting is that?

15   A.   That's going to be the seized property specialist's

16   handwriting.

17   Q.   Okay.  And were you present when this bag was written

18   on?

19   A.   Yes, I was.

20   Q.   Can you confirm that the meth that was in that

21   Band-Aid box was put in this bag?

22   A.   Yes, I can.

23   Q.   You'll see on that bag the name "Mario Hernandez."

24   Why is that name on this bag?

25   A.   The day of the seizure when we -- when I went over to

1    take the methamphetamine, I couldn't recall the last name

2    for the individual that the methamphetamine was purchased

3    from.  So I called the case agent at the time and

4    Agent Rodriguez had relayed the last name Hernandez, so I

5    provided the last name Hernandez to the seized property

6    specialist, which was incorrect.

7    Q.   Have you since learned the name of the person who sold

8    Agent Lujan the methamphetamine on May 8, 2018?

9    A.   Yes, I did.

10    Q.   Agent Ortiz, what is his name?

11    A.   Mario Alberto Reynoso.

12    Q.   I'm now showing you what's been previously marked as

13    Government's Exhibit 1.  Have you reviewed it?  And what is

14    it?

15    A.   It's a sealed evidence bag that contains

16    methamphetamine, crystal methamphetamine, in it.  And then

17    there is a chain of custody receipt on the back end of the

18    bag right here.

19    Q.   When you say "a sealed evidence bag," do you recognize

20    it, personally?

21    A.   Yes, I do.

22    Q.   And what do you recognize it as?

23    A.   The same bag as being in Exhibit 16.

24          MS. HAMMOND:  Your Honor, I now move to admit

25    Government's Exhibit 1 into evidence.

 1          MR. CLARK:  Your Honor, can I just take a quick

 2   look at the chain of custody --

 3          THE COURT:  Yes, sir.

 4          MR. CLARK:  -- receipt, Your Honor?

 5          Your Honor, I'll maintain my same objection.  I

 6   understand it's been explained on cross-examination, but I

 7   object to the entry of that.  It's got the wrong name of the

 8   defendant, Judge.

 9          THE COURT:  Government's Exhibit 1 is admitted.

10   (Government's Exhibit 1 was admitted into evidence.)

11          MS. HAMMOND:  I'd like to publish this exhibit

12   using the ELMO.  Thank you.

13   Q.  (BY MS. HAMMOND):  And Agent Ortiz, one more

14   time, what are we looking at here?

15   A.   We're looking -- well, in this case, from the

16   projector, it's going to be the sealed evidence bag with the

17   writing indicating the seizure number, the violator's name,

18   48.7 grams are the contents within it, which is

19   methamphetamine.

20          MS. HAMMOND:  May I have a moment, Your Honor?

21          THE COURT:  (Indicating.)

22              (Discussion off the record.)

23   Q.  (BY MS. HAMMOND):  One more question, Agent

24   Ortiz.

25   A.   Yes.

1    Q.   In the video, were you able to make out what the other

2   voices in the recording were saying, the voices of the

3   undercover agent and the defendant?

4    A.   No, I was not.

5           MS. HAMMOND:  I have no further questions, Your

6   Honor, at this time.

7           THE COURT:  Thank you.

8           Mr. Clark?

9           MR. CLARK:  Thank you, Judge.  May it please the

10   Court and Counsel.

11                    **CROSS-EXAMINATION**

12    Q.   (BY MR. CLARK):  Good afternoon, Agent Ortiz.

13    A.   Afternoon, sir.

14    Q.   You know who I am and I know you, right?

15    A.   Yes, sir.

16    Q.   I wanted -- I'm not going to play the video again.

17   You just saw the video that we've introduced, and is it

18   pretty obvious that the windows were tinted on that car?

19    A.   Yes, it is.

20    Q.   And I know this may be vague, but it's a fairly dark

21   tint, wasn't it?

22    A.   Yes, it was a fairly dark tint, yes, sir.

23    Q.   And from where you were, you could not identify the

24   female passenger due in part to that tint; is that a fair

25   statement?

1    A.   Very fair, yes.

2    Q.   And you also personally could not identify the driver

3    based on that transaction, alone, could you?

4    A.   No, I could not.

5    Q.   And earlier, the Government asked who you believed

6    actually delivered that, the drugs, that day, right?

7    A.   Yes, sir.

8    Q.   And you were kind of talking about was it Mario

9    Hernandez or Mario Reynoso, correct?

10    A.   Correct.

11    Q.   And you had to rely on others for that information,

12    didn't you?

13    A.   Yes, that's correct.

14    Q.   So as we stand here today, even though you were

15    filming, you cannot positively identify Mr. Reynoso

16    (indicating) as the driver of that vehicle, can you?

17    A.   I cannot, no.

18    Q.   After you took custody of the Band-Aid box and drugs,

19    do you know if they were tested for contact DNA or

20    fingerprints?

21    A.   No, they -- to my knowledge, they weren't.

22    Q.   Okay.  One last question:  Going back to the video, I

23    forgot what the other agent's name was who actually did the

24    undercover?

25    A.   Agent Lujan.

1    Q.   That's it.  Agent Lujan, you saw the video I did.  He

2    walked up to the car and would you agree that, within a

3    second or two, he immediately got into the back?

4    A.   It was a short time frame when he got in.  I can't

5    recall, but it was shortly -- it was pretty quick that he

6    got into the vehicle, yes, sir.

7    Q.   Okay.  Could you tell from where you were if the

8    driver's window came down?

9    A.   No, I could not.

10   Q.   Could you tell if there was a coat or anything hanging

11   on the back seat?

12   A.   No.

13   Q.   So your visibility was pretty bad that day of what was

14   going on inside; is that a fair statement?

15   A.   That day, you could actually tell, like I had

16   previously stated, that there was two individuals in the

17   vehicle as it arrived.  But as you can tell, like, looking

18   at the video, the tint was fairly dark, so it was very

19   limited, the visibility.

20   Q.   Okay.  And was it obvious that the windows were tinted

21   when the vehicle rolled up?

22   A.   Yes.

23   Q.   You saw that immediately, didn't you?

24   A.   Oh, yeah.

25   Q.   And you were all the way across the parking lot,

1    weren't you?

2     A.   Actually, it was a shorter distance.  It wasn't too,

3    too far.

4     Q.   Ballpark estimate, how far -- again, I'm not going to

5    hold you (indicating)...

6     A.   Maybe about 10 vehicle spaces, maybe a little -- 10 to

7    15 vehicle spaces to fairly close.

8     Q.   So even from 10 to 15 vehicle spaces, you could

9    immediately tell the windows were tinted, correct?

10    A.   Correct.

11           MR. CLARK:  I have no further questions.  Thank

12    you.

13           THE COURT:  Ms. Hammond?

14           MS. HAMMOND:  Nothing further, Your Honor.

15           THE COURT:  May the witness be excused?

16           MS. HAMMOND:  Yes, Your Honor.

17           MR. CLARK:  Yes, Your Honor.

18           THE COURT:  Agent, you're free to go on about

19    your business.  Thanks very much.

20           THE WITNESS:  Thank you.

21           THE COURT:  Watch your step.

22           Government's next witness?

23           MS. CAMACHO:  Your Honor, the United States calls

24    Agent Joey Rodriguez.

25

1          **JOEY S. RODRIGUEZ,**

2          After having been first duly sworn, did make the

3     following answers:

4                **DIRECT EXAMINATION**

5          THE COURT:  Thank you.  Have a seat.

6     Q.   (BY MS. CAMACHO):  Can you state your name for

7     the record.

8     A.   Yes, ma'am.  Joey S. Rodriguez.

9     Q.   How are you employed?

10    A.   I'm employed with the Department of Homeland Security

11    as a Homeland Security investigator.

12    Q.   You're a special agent with HSI?

13    A.   Special agent with HSI, yes, ma'am.

14    Q.   How long have you been a special agent with HSI?

15    A.   I've been, approximately three years, a special agent.

16    Q.   What did you do prior to that?

17    A.   Prior to that, I was a United States Border Patrol

18    agent for approximately ten years.

19    Q.   So I'm -- I want to talk first about how this case

20    began.  What was your role in this investigation that led us

21    here today?

22    A.   I was the case agent of the investigation.

23    Q.   Okay.  What does it mean to be the case agent?

24    A.   As a case agent, I pretty much oversee all the other

25    agents, officers, when it comes to -- to getting

1    information, confirming it, dispelling it, things like that.

2    And at the same time, I'm able to -- when, for example,

3    there's operations, I assign people certain duties for them

4    to take on and then, of course, just pretty much try to keep

5    the investigation going and furthering it as we move on.

6    Q.   Can you tell us when this investigation first started?

7    A.   Yes, ma'am.  It first started back on April 20th of

8    2018.

9    Q.   And how did it start?

10   A.   We received information referenced to an individual by

11   the name of Mario.  The source didn't know what Mario's last

12   name was, but the source was able to provide us a phone

13   number and also a -- a -- was able to provide a phone number

14   and then, as she moved on, gave us the information, the

15   source ended up stating that it was a Facebook that she

16   believed was the -- was an individual by the name of Mario.

17   Q.   So let me slow you down for a second, you're talking

18   about a "source."  What do you mean by that?

19   A.   A "source" is a person that is cooperating with the

20   Government or giving information to the Government, provides

21   information on illegal activity.

22   Q.   And you commonly refer to them as a "cooperating

23   source" or a "source of information"?

24   A.   Yes, ma'am.

25   Q.   And so you said a source of information provided you

1   with the name Mario --

2   A.   Yes, ma'am.

3   Q.   -- right?  Did the source know the last name of this

4   individual?

5   A.   No, she did not.

6   Q.   And you -- you said she provided you with a phone

7   number?

8   A.   Yes, she did.

9   Q.   Do you know what that phone number was?

10  A.   Yes.

11  Q.   What was it?

12  A.   It was (915) 549-2841.

13  Q.   Is that the same phone number that ended up being in

14  contact with Agent Lujan?

15  A.   Yes, it is.

16  Q.   At the time when the source was first providing this,

17  you said she didn't know the last name.  Did you have her

18  take any steps to try and determine the suspect's last name?

19  A.   Yes, we did.  We requested to see if she -- if it

20  would be possible for her to continue to get more

21  information.  At which time, at a later time, she did

22  provide to us a photo of Mario's plate that was placed on

23  the Ford Fusion on the -- later known to be the 2011 Ford

24  Fusion.

25  Q.   I'm going to back you up again.  You said earlier

1    something about a Facebook page.  Did the source -- you said

2    something about a Facebook page and that she tried to

3    determine if it was the defendant's.  Can you describe that

4    a little bit more?

5    A.    Yes.  She provided us a Facebook page that she was

6    under the impression that it was going to be Mario.  The

7    Facebook page actually stated it was Mario Hernandez, but

8    she wasn't sure if it was Mario Hernandez or not.  She just

9    said it was Mario, and she believed that was going to be the

10   individual as far as the last name.

11   Q.    Was she sure whether or not that Facebook page

12   belonged to the Mario that she was telling you about?

13   A.    She was not too sure.

14   Q.    Is that how the name "Hernandez" came to be involved

15   in this investigation?

16   A.    Yes, ma'am.

17   Q.    Okay.  Subsequent to that, looking at that Facebook,

18   was there any ever any other involvement of anyone named

19   Mario Hernandez in this investigation?

20   A.    No, ma'am, there was not.

21   Q.    After the source told you that this Facebook might

22   belong to the Mario she was talking about, you said she

23   provided a license plate?

24   A.    Yes.  There was a license plate.

25   Q.    How did she provide that to you?

1    A.    Through a photo through text message.  She sent it

2    over to me.

3    Q.    But in a photograph?

4    A.    Yes, a photograph, yes, ma'am.

5    Q.    I've placed in front of you what's been marked as

6    Government's Exhibit 20.  Do you recognize that?

7    A.    Yes, I do.

8    Q.    And what is that?

9    A.    That is the photo of Mario Hernandez -- correction,

10   Mario Reynoso.  I apologize for that.  Mario Reynoso.  We

11   ran the plate --

12   Q.    Okay.  Let me stop you, Agent.  That's not a picture

13   of a person --

14   A.    No.

15   Q.    -- so tell me what that's a picture of.

16   A.    That is a picture of the plate that was provided to

17   us.

18   Q.    Okay.

19              THE COURT:  Counsel, Government's 20 that I have

20   is not a picture of a car.  It's a picture of some scissors

21   and a couple of plastic bags.

22              MS. CAMACHO:  Okay.

23              MR. CLARK:  Likewise.

24              MS. CAMACHO:  I'm sorry, maybe I...okay.  If I

25   wore my glasses.  It's Government's Exhibit 28.  I

1    apologize, Your Honor.

2              THE COURT:  Okay.

3              MS. CAMACHO:  Little bitty numbers.

4    Q.   (BY MS. CAMACHO):  Government's Exhibit 28, can

5    you tell us what that is?

6    A.   That is a picture of the back of a vehicle with a

7    license plate displaying KNJ4185.

8    Q.   Is that the picture that was provided to you by the

9    confidential source?

10   A.   Yes.

11             MS. CAMACHO:  Your Honor, I would move for the

12   admission of Government's Exhibit 28.

13             MR. CLARK:  No objection, Your Honor.

14             THE COURT:  28 is admitted.  Thank you.

15   (Government's Exhibit 28 was admitted into evidence.)

16             MS. CAMACHO:  And if you could show that to the

17   jury, please.

18   Q.   (BY MS. CAMACHO):  Agent, once you received

19   that picture and that license plate, what did you do

20   in terms of further investigating that license

21   plate?

22   A.   Once we received the plate, we went ahead and ran the

23   plate and received the information on who it was registered

24   to.  Once the -- once we got that information, we noticed

25   the plate was registered on Mario Alberto Reynoso.

1    Q.   When you say "ran the plate," what does that mean?

2    A.   We ran it through a database, NCIC database, which

3    gives us a return; also used different State systems, such

4    as Texas, New Mexico, whatnot.

5    Q.   So the database showed that it was registered to Mario

6    Alberto Reynoso.  Did it tell you what city and state he

7    lived in?

8    A.   Yes.  El Paso, Texas.

9    Q.   Did you learn what kind of vehicle that license plate

10   was assigned to?

11   A.   Yes.  We learned that it was assigned to a 2011 Ford

12   Fusion.

13   Q.   And did you subsequently obtain a certified vehicle

14   history for that same vehicle?

15   A.   Yes, we did.

16   Q.   So I'm going to show you what's been marked as

17   Government's Exhibit 34.

18           Can you tell me what that is?

19   A.   Yes.  This is a true and complete copy of the Texas

20   Department of Motor Vehicles title history for that vehicle.

21   Q.   Is that certified from -- as a certified public record

22   from the Texas Department of Motor Vehicles?

23   A.   Yes, it is.

24           MS. CAMACHO:  Your Honor, I would move to admit

25   Government's Exhibit 34.

1                    THE COURT:  Any objection?

2                    MR. CLARK:  No objection, Your Honor.

3                    THE COURT:  34 is admitted.

4     (Government's Exhibit 34 was admitted into evidence.)

5     Q.  (BY MS. CAMACHO):  Looking at that document, at

6     Exhibit 34, can you tell the jury when the

7     defendant, Mario Reynoso, first applied for a title

8     for that vehicle?

9     A.   Yes, ma'am.

10    Q.   When was that?

11    A.   It was going to be on March 20th, 2018.

12    Q.   I'm sorry.  March what date?

13    A.   March 20th.

14    Q.   March 20th, 2018?

15    A.   Yes, ma'am.

16    Q.   Okay.  And did the vehicle remain in the defendant's

17    name at all times after that date?

18    A.   Yes, ma'am, it did.

19    Q.   And you've looked at this document before coming to

20    court, correct, Agent?

21    A.   Yes, ma'am, I did.

22    Q.   Did -- and what license plate was on that vehicle when

23    it was first titled in the defendant's name in March of

24    2018?

25    A.   It was -- the plate number on it was KNJ4185.

1    Q.   Which is the same plate as in your picture that we

2    just looked at?

3    A.   Yes.

4    Q.   Did there come a time when the defendant applied for a

5    new title to the vehicle?

6    A.   Yes, there was.

7    Q.   When was that?

8    A.   June 14th, 2018.

9    Q.   Can you tell from the records why he applied for a new

10   title?

11   A.   Under the records, there was a lien.  He received some

12   type of loan, I believe; there was a lien placed on that

13   title and there was a new title that was reissued.

14   Q.   Was the title still under the defendant's name?

15   A.   Yes.

16   Q.   And was it still with that same license plate in June

17   of 2018?

18   A.   Yes, ma'am.

19   Q.   Did there come a time when the license plate was, in

20   fact, changed on the vehicle?

21   A.   Yes, there was.

22   Q.   What was the license plate changed to?

23   A.   It was changed to LMZ7814.

24   Q.   Do the records indicate why a new license plate was

25   obtained?

1    A.    Indicates that it was changed, I believe -- I believe

2    it was under -- because it was a new title that was issued.

3    Q.    Was the license plate changed back in June of 2018

4    when -- when the new title was issued or was the new license

5    plate changed sometime after that?

6    A.    It was changed sometime after that.

7    Q.    Do the records just reflect that it was replaced?

8    A.    Yes.

9    Q.    Under the new license plate, was the car still

10   registered to the defendant?

11   A.    Yes, it was.

12   Q.    So going back now to the time around April 2018, when

13   you first learned that the car in question was registered to

14   the defendant, did you take any steps to confirm with the

15   source who was giving you information that the defendant,

16   Mario Reynoso, was, in fact, the Mario that she had told you

17   about?

18   A.    Yes, I did.

19   Q.    What did you do?

20   A.    We received the plate number again.  We ran that plate

21   number, got a name from it.  Once we received the name and

22   actual address, we were able to also retrieve the registered

23   owner's, which is Mario Reynoso, date of birth.  We ran his

24   name and date of birth; came back with a driver's license

25   out of Texas.  We confirmed that the driver's license and

1    the address on the registration was one and the same.

2              In addition, we ran the phone number, and that

3    phone number came back registered to also Mario Reynoso.

4              Once we were able to -- to confirm the date of

5    birth and get that photo of the driver's license, I was able

6    to put it into a six-pack photo lineup.

7    Q.    What is a six-pack photo lineup?

8    A.    It's a photo lineup of similar individuals, weight,

9    height, ethnicity, and even the background.  What we

10   basically did is we provided six individuals with no name on

11   it, just numbers, to the source.  The source was able to

12   look at those six and identify.  At which time, she was able

13   to identify Mario Reynoso in the picture by circling the

14   number.

15   Q.    As the Mario that she had told you about?

16   A.    Right.

17   Q.    Agent, I'm showing you what's been marked as

18   Government's Exhibit 29.

19              Can you tell me what that is?

20   A.    That's the photo lineup that we provided to the

21   source.

22   Q.    Is that a true and accurate copy of it?

23   A.    Yes, it is.

24              MS. CAMACHO:  Your Honor, I move for the

25   admission of Government's Exhibit 29.

```
 1                    MR. CLARK:  No objection, Your Honor.
 2                    THE COURT:  29 is admitted.
 3    (Government's Exhibit 29 was admitted into evidence.)
 4                    MS. CAMACHO:  And if you could publish it?
 5    Q.   (BY MS. CAMACHO):  Agent, I can see in the
 6    bottom -- or sorry, bottom left-hand corner,
 7    Number 4 is circled.  Why is that number circled?
 8    A.   It was circled to identify the individual that she had
 9    given this information on, which is Mario.
10    Q.   And was the confidential source the person who circled
11    that number?
12    A.   Yes, it is.
13    Q.   Thank you.
14              I want to talk now a little bit about how the --
15    the name on the bag came to be Mario Hernandez.  Were you
16    present during the transaction that Agent Lujan testified
17    about earlier, where he bought the 2 ounces of
18    methamphetamine, on May 8th of 2018?
19    A.   Yes, I was.
20    Q.   What were you doing during that transaction?
21    A.   Pretty much was running -- giving everybody their
22    positions where they were going to be at; assignments,
23    assigning everybody to surveillance, others to -- once the
24    transaction was conducted, they were to take the actual
25    evidence to -- back to El Paso, and basically just the
```

1   logistics of the operation.

2    Q.   Were you able to see, physically see, enough to

3   identify the defendant during that transaction?

4    A.   I'm sorry, could you repeat that?

5    Q.   Were you able to physically identify the defendant

6   during the transaction?  Could you see well enough into the

7   car to identify him?

8    A.   No, I could not.

9    Q.   Could you identify the female passenger?

10    A.   No, I could not.

11    Q.   What did you do following the actual purchase?

12    A.   So after the purchase was conducted, we followed the

13   vehicle out.  I requested for Special Agent Ortiz to take

14   the evidence back to the El Paso evidence holding room.  We

15   did follow the vehicle out, which was being driven with the

16   plates of KNJ4185.  During that time, I was the -- what we

17   call the "lead" in the surveillance, the "eye."  And during

18   the time when I was following the gray Ford Fusion, I was

19   not only driving, but also handling the radio transmissions

20   because, as you're conducting a surveillance and you're

21   following this vehicle, you've got to be giving out

22   locations so that your other officers and agents can assist

23   you.  At the same time, I'm also trying to -- it was

24   pretty -- I would say pretty heavy traffic, I would say

25   medium to heavy traffic.  There was construction, so I got a

1   phone call at that time, and Special Agent Ortiz had called

2   me to ask what the name of the -- of the individual that we

3   were investigating, what his last name was, at which point,

4   I inadvertently with everything going on -- I had the radio,

5   I had transmission, driving, looking at the vehicle, calling

6   out transmissions -- I inadvertently gave a last name of

7   Hernandez.

8   Q.   At that time, were you in any way investigating Mario

9   Hernandez?

10  A.   No.

11  Q.   At that time, did you have any subjective belief that

12  someone named Mario Hernandez was involved in this at all?

13  A.   No.

14  Q.   So it was just a slip of the tongue?

15  A.   A slip of the tongue, yes, ma'am.

16  Q.   You said you followed the defendant -- you-all were

17  following the defendant as he left the casino parking lot

18  there.  Were you able to determine where he went?

19  A.   Yes.  We followed him out to a Super 8 Motel off of

20  Gateway East in El Paso, Texas.

21  Q.   Were you able to see what room he went into?

22  A.   Yes, we saw him go into Room 133.

23  Q.   Did you later go back to try and get motel records

24  from the motel to see who might have registered that room?

25  A.   Yes, I did.

1    Q.   Were you able to get those records?

2    A.   I was not.  At the time when I talked to the manager

3    of Super 8 Motel, I requested the records of the person

4    staying at room 133 on that day.  Unfortunately, they had

5    just moved into a new system, so all the -- the -- they

6    actually had the new system in place in June of 2018, so

7    anything prior to June 2018 was lost.  We weren't able to

8    get any of that information --

9    Q.   Okay.

10   A.   -- because of a system change.

11   Q.   Was the defendant arrested on that date, May 8th,

12   after he sold the meth, the methamphetamine to the

13   undercover agent?

14   A.   No, he was not.

15   Q.   Why didn't you arrest him that day?

16   A.   We needed to further the investigation, try to

17   continue to get leads, try to figure out if there was other

18   places, persons, associates.  So we decided to go ahead and

19   not make the arrest at the time.

20   Q.   When did you eventually arrest the defendant for the

21   sale of the methamphetamine to the undercover agent?

22   A.   We did the arrest on January 30th of 2019.

23   Q.   So my math is not very good, but about seven months or

24   so after the incident?

25   A.   Yes, ma'am.

1    Q.    Okay.  How was it that you came to arrest him at that

2    specific time?

3    A.    We had requested -- well, there was a grand jury

4    Indictment that later resulted in a warrant of arrest and at

5    which point we went ahead and conducted that -- that arrest

6    of the -- using the arrest warrant.

7    Q.    Where did you physically arrest him at?

8    A.    In El Paso, Texas.

9    Q.    And was the El Paso Sheriff's Office assisting with

10   that?

11   A.    Yes, he was [sic].

12   Q.    Were you physically present when he -- when defendant

13   was arrested?

14   A.    Yes, I was.

15   Q.    At the location where he was arrested, did you arrive

16   first or did the defendant arrive first?

17   A.    I arrived first.

18   Q.    So did you observe as he arrived at the location?

19   A.    Yes.

20   Q.    What was he driving when he arrived there?

21   A.    A gray in color Ford Fusion.

22   Q.    Was that the same vehicle that you had seen him in on

23   May 8th of 2018 during the purchase?

24   A.    Yes, it was.

25   Q.    What license plate did it have on that day in January

1    of 2019?

2    A.    The plate was -- that was displaying was LMZ7814.

3    Q.    And is that the same plate that the records indicate

4    was the replacement license plate on that vehicle?

5    A.    Yes.

6    Q.    When the defendant arrived there, was he driving or

7    was he a passenger?

8    A.    He was driving.

9    Q.    Was there anyone else in the vehicle?

10   A.    No.  He was alone.

11   Q.    Did the defendant have a cell phone on him at the time

12   of his arrest?

13   A.    Yes, he did.

14   Q.    Was it in the vehicle or was it on his person?

15   A.    It was -- at the time, it was in his vehicle.

16   Q.    Did you seize that cell phone?

17   A.    Yes, we did.

18   Q.    And what was the number for that cell phone?

19   A.    The number for that cell phone was 412...-1734.

20   412-1734.

21   Q.    Would -1743 [sic] be possible?

22   A.    -1743, yes.

23   Q.    It's a lot of numbers.  And that's a 915 area code?

24   A.    915, yes.

25   Q.    Did you subsequently obtain a search warrant to search

1    through that phone?

2    A.   Yes.

3    Q.   And did you do so?

4    A.   Yes, we did.

5    Q.   I've shown you what's been marked as Government's

6    Exhibit 32.

7             Can you tell me what that is?

8    A.   Yes.  It's the text messages pulled from the phone

9    that Mario was in possession of that day of his arrest.

10   Q.   Are those all the text messages that were on that

11   phone or is it a sampling?

12   A.   It's a sampling.

13   Q.   And you've looked through the phone personally as well

14   as those text messages?

15   A.   Yes, I have.

16   Q.   And are those excerpts correct depictions of the text

17   messages that were on that phone?

18   A.   Yes, they are.

19             MS. CAMACHO:  Your Honor, I'd move the admission

20   of Government's Exhibit 32.

21             MR. CLARK:  No objection, Your Honor.

22             THE COURT:  32 is admitted.

23   (Government's Exhibit 32 was admitted into evidence.)

24             MS. CAMACHO:  If I may have just a moment, Your

25   Honor.

1    Q.   (BY MS. CAMACHO):   Agent, I want to talk about

2    a few of these text messages.   We are not going to

3    read nearly all of them, but first, let me ask you,

4    the way that this chart is set up, am I correct that

5    it's set up with sort of conversation with

6    individuals' phone numbers throughout the chart?

7    A.   Yes, it is.

8    Q.   When a name is written for an individual section, is

9    that the contact name that was listed in the phone for that

10    phone number?

11    A.   Yes, it is.

12    Q.   So turning to page 4, I want to look at the bottom of

13    page 4 where the text message -- the very last sort of

14    section, if you will, where the text messages start on

15    January 30th.   Can you read those three at the bottom of

16    that page and the first four on the top page and give us the

17    date of -- well, I guess they're all on January 30th, but if

18    you could read those text messages?

19    A.   Sure.   (Reading) January 30th, 2019, approximately

20    9:38 from sender (915) 759-1973 to Mario Reynoso.   Message

21    is, "What's up?  Was in the shower."

22          Approximately a minute later, Mario responds,

23    "Yo, okay."

24          The (915) 759-1973 responds about approximately

25    40 seconds later, "Yeah, I'm good.   Thank you.   How about

1    you?  You good?"

2              Mario responds, "Yeah, just out of here.  Making

3    some drops.  Hey, do you have anything for me?"

4              The (915) 759-1973 responds to Mario, "Yeah, I

5    feel you just please keep *trucha* to be honest.  Nah, I

6    haven't really been moving.  They're suppose to come for a

7    full, but I am just waiting.  But as soon as I do, I got

8    you.  Promise.  I want to have you paid before I go in."

9              9:43, Mario responds, "Okay, TY" for "thank you."

10             9:45, phone number (915) 759-1973 responds to

11   Mario, "Thank you for everything, *Neta*.  And when I come

12   back out, I'll be ready again to be on your team."

13             9:46, Mario responds --

14   Q.   And you can stop there --

15   A.   Okay.

16   Q.   -- Agent.

17             So Agent, based on your knowledge of this

18   investigation and your training and experience as a drug

19   trafficker -- as a drug investigative agent, when Mario

20   Reynoso asks -- says he was out making some drops and asks

21   the other person, "do you have anything for me," what

22   importance does that have for you?

23   A.   That is significant because he's basically asking the

24   759-1973 number that if he had any kind of money for him.

25   So as you can see, he was making drops, something that the

1    traffickers or the narcotic -- people that are in sales of

2    narcotics will say they're out making drops or sales of

3    that.  And of course, "do you have anything for me" would be

4    he's asking his -- this individual who we believe is

5    actually working for him selling narcotics is asking -- or

6    Mario was asking him if he had anything else for him; in

7    other words, the money from the narcotics sales.

8    Q.   And in the next line, when the unknown person says, "I

9    haven't really been moving, they're supposed to come for a

10   full one," what does that indicate to you?

11   A.   So that he's basically saying that he hasn't been able

12   to sell the products or the narcotic.  And they're promising

13   that they're going to be back to buy some from him.  So at

14   that point, that's what it indicates to me.

15   Q.   And then, turning to page 8 in this document, looking

16   at the last section on that page, could you read the first

17   four text messages in that section?

18   A.   It's January 29th, 2019, at 6:30.  Mario Reynoso text

19   messages 214-612- --

20   Q.   I'm not sure we're on the same page.

21   A.   Is that page 8?

22   Q.   Page 8 on the bottom section, the January 30th.

23   A.   The January 30, 2019 at 8:14.  Sender (214) 612-6174

24   sends a text message to Mario Reynoso (reading), "Yo."

25            At 8:53, Mario responds, "Yo."

1          At 9:19, (214) 612-6174 responds, "Let me get

2     another."

3          At 9:21, Mario responds to (214) 612-6174, "Okay,

4     on my way."

5     Q.   Okay.  And you can stop there.

6          What importance, as a narcotics agent, does that

7     exchange have for you when this person is saying, "Let me

8     get another," and Mario Reynoso is saying "Okay, on my way"?

9     A.   Basically asking for some more narcotics and that

10    Mario is actually supplying this individual with narcotics.

11    Q.   And then turning to the next page, page 9, at the top

12    of the page, can you read the first, I'll say, six lines on

13    that page?

14    A.   January 27, 2019, 7:56, sender (915) 253-1192 sends a

15    text message to Mario Reynoso (reading), "Yo, where you at?"

16         At 7:57 Mario responds to the text, "Yellow Super

17    8, bro', Super 8.  What's up?"

18         At 8:06, the sender (915) 253-1192 responds to

19    Mario, "Well, I just needed one *para los huesos,* and then

20    after I get my check, I'll get more."

21         At 8:08, Mario responds, "Okay."

22         At 8:16, sender (915) 253-1192 texts Mario, "I'll

23    call you when I'm close by."

24         At 8:19, Mario responds, "K."

25    Q.   And Agent, you speak Spanish, correct?

1    A.    Yes, I do.

2    Q.    So in the middle of that where the unknown person

3    says, "Well, I just needed one *para los huesos,*" what does

4    that mean in English?

5    A.    So basically what it means to us is he is asking --

6    Q.    Well, can you actually just translate it for me first?

7    A.    "For the bones."

8    Q.    For your -- okay.

9    A.    "For the bones," yes.

10   Q.    Tell me, what do you understand that to mean?

11   A.    We know it as he's asking for a narcotic fix right

12   then and there for -- just to get him by.

13   Q.    And then he says, "After my check, I'll get more?"

14   A.    Yes, he does.

15   Q.    And then turning to page 10, can -- there's an

16   exchange with an "Angie" at the top.  Can you read that

17   exchange?

18   A.    Yes.  January 22nd, 2019, 4:30, sender (915) 504-4003

19   to recipient Mario Reynoso (reading), "Hey, I need another

20   one."

21            Mario Reynoso responds, at 4:33, "Okay, I'm OMW,"

22   which basically means "I'm on my way."

23            4:34 sender (915) 504-4003 texts Mario, "They

24   just canceled."

25            At 4:35, Mario responds, "Oh."

1          At 4:36, (915) 504-4003 texts Mario, "No, no,

2    they want half."

3    Q.    And Agent, what is important to you in this exchange?

4    A.    It's important to me because it shows that Mario was

5    intending on delivering a narcotic to this Angie.  She or he

6    tried to cancel and then, later on, figured that they were

7    going to need that half of whatever unit that they were

8    requesting of narcotic.

9    Q.    And Agent, I'm not going to go through all of these,

10   but does the same sort of theme go on throughout these

11   texts?

12   A.    Yes, it does.

13   Q.    And looking at the names on some of these, obviously,

14   some of them don't have the names, but the names like

15   "Angie" and "Smoke," "Big," "Wonders," "Susanna," are all of

16   those names that I just read names that -- of people that

17   the defendant is talking to while he's in prison?

18   A.    Yes.

19   Q.    Or I'm sorry, in jail --

20   A.    Yes --

21   Q.    -- awaiting trial in this case?

22   A.    -- yes, it is.

23   Q.    And the exhibit that I showed Agent Lujan earlier he

24   had not seen before the defendant got arrested, but the

25   picture of tattoos, Exhibit 35, were those, in fact, the

1    pictures of the defendant's tattoos that were taken at his

2    arrest in January that we were just talking about?

3    A.   Yes, they are.

4    Q.   So subsequent to the defendant's arrest and, you know,

5    examining his phone and everything, did you obtain phone

6    records for both the phone that set up the transaction on

7    May 8th and for the phone that was seized from the defendant

8    at the time of his arrest in January?

9    A.   Yes, I did.

10   Q.   So I've placed in front of you two rather large

11   exhibits, Exhibits 30 and 31.  Can you tell me what those

12   are?

13   A.   Yes, ma'am.  These are the requests made to T-Mobile

14   and AT&T in reference to both phones, both Mario Reynoso's

15   phones.

16   Q.   Those are the records that you received in response to

17   the subpoena requests for the phone information?

18   A.   Yes, they are.

19   Q.   And do each of those exhibits carry a certificate from

20   the phone company, certifying that they are true and

21   accurate business records?

22   A.   Yes.

23          MS. CAMACHO:  Your Honor, I'd move for the

24   admission of Government's Exhibit 30 and 31.

25          MR. CLARK:  No objection, Your Honor.

1    THE COURT:  30 and 31 are admitted.

2    (Government's Exhibits 30 and 31 were admitted into

3    evidence.)

4    Q.  (BY MS. CAMACHO):  So looking for -- you're

5    going to have to take out the first couple of pages

6    of each one.  Looking, first, at Exhibit 30, those

7    records are for phone number (915) 549-2841, the

8    phone number that was used on May 8th of 2018 to

9    arrange the purchase.  What do the records show with

10   regards to the subscriber information for that phone

11   number.

12   A.   It shows the MSI ID identifier which is (915)

13   549-2841, subscribed to on March 1st, 2018, ended June 30th,

14   2018.

15   Q.   And who does it show as the subscriber to that phone,

16   the registered person on that phone?

17   A.   It's registered to Mario Reynoso.

18   Q.   And turning, then, to Exhibit Number 31, which is the

19   (915) 412-1743 [sic] phone number that we were just talking

20   about from the text messages, what does the information show

21   in terms of who was the subscriber for that phone number?

22   A.   Subscriber shows as a [sic] Eric Delgado.

23   Q.   In your experience as a narcotics officer, is it usual

24   or unusual for a drug trafficker to have a phone subscribed

25   to in somebody else's name?

1    A.    No, it's not unusual.

2    Q.    Is it always so that they have it in someone else's

3    name?

4    A.    No, not always.  But it's not unusual to find it -- a

5    phone not subscribed to that person.

6    Q.    Okay.  And in your experience, how often do drug

7    traffickers change their telephone number?

8              MR. CLARK:  Objection, Your Honor --

9    A.    I would say frequent --

10             MR. CLARK:  -- objection.  That was vague.

11             THE COURT:  Vague, and I don't know what we've

12   established any expertise in that regard, so you might try.

13             MS. CAMACHO:  I will.

14   Q.    (BY MS. CAMACHO):  Agent, in your narcotics

15   trafficking work, have you studied phone numbers and

16   phones used by narcotics traffickers in terms of how

17   long they typically maintain their telephone

18   numbers?

19   A.    Yes, I have.

20   Q.    And have you spoken to narcotics traffickers about how

21   and why they might change their phone numbers?

22   A.    Yes, I have.

23   Q.    Through your experience, have you come to understand

24   the reasons and the frequency with which narcotics

25   traffickers change their telephone numbers?

1    A.    Yes, I have.

2    Q.    So in your experience, is it common for drug

3    traffickers to change phone numbers?

4    A.    Yes, it is.

5    Q.    Do they do that on a fairly frequent basis, generally?

6    A.    It is frequent.

7    Q.    When you -- when the defendant was arrested on

8    January 30th of 2019, did you have a chance to hear his

9    voice at the time of his arrest?

10    A.    Yes, I did.

11    Q.    Okay.  Additionally, have you listened to the calls

12    that we played here earlier, the calls with Agent Lujan in

13    May and June of 2018?

14    A.    Yes, I have.

15    Q.    Have you listened to them just once or multiple times?

16    A.    Multiple times.

17    Q.    Have you also reviewed jail calls from the Doña Ana

18    County jail where the defendant has been held since his

19    arrest in January?

20    A.    Yes, I have.

21    Q.    What are we talking about when we say "jail calls"?

22    A.    Jail calls being placed from Mario to family members,

23    friends, associates.  It's calls that are made from the

24    county jail out to the -- out to the public.

25    Q.    And are all calls from jails recorded?

1    A.   Yes, they are.

2    Q.   As law enforcement, you have the ability to obtain

3    copies and to listen to those jail calls?

4    A.   Yes, ma'am.

5    Q.   Can you explain to us how certain calls -- so if you

6    call -- if you requested from the jail, "I want to get a

7    copy of all of Mario Reynoso jail calls," how would they

8    know which calls are his?  How is the system maintained?

9    A.   So it's maintained -- basically, when an inmate

10   arrives at the jail, they're given a booking number.  If

11   it's the first time at the jail, they're also given an ID

12   number, a six-digit ID number.  That ID number sticks with

13   the inmate.  It doesn't matter how many times -- the booking

14   number will change, but the ID number always stays the same.

15   They assign that ID number to, basically, like a phone call

16   that he can utilize to make calls out of the jail.  Not only

17   is that six-digit ID number assigned to the inmate, in this

18   case, to Mario, they are also given a four-digit pin, sort

19   of like an ATM card, just to layer it as a security feature.

20   They utilize the six-digit ID and the four-digit passcode to

21   make those calls.

22   Q.   And those calls are recorded in their entirety?

23   A.   Yes, they are.

24   Q.   Have you listened to the jail calls that the defendant

25   Mario Reynoso made from the jail?

1    A.    Yes, I have.

2    Q.    Approximately how many phone calls from the jail would

3    you say that you've listened to made by the defendant?

4    A.    At least 500 or more.   500 or more jail calls.

5    Q.    Approximately how many hours of jail calls would that

6    entail, how many hours of listening?

7    A.    30 hours or more.

8    Q.    The calls are limited to 15 minutes each on the

9    system, correct?

10   A.    Yes, 15 minutes.   And at least 30 hours.   I'm sure

11   there's been a lot more.

12   Q.    Okay.   In listening to those calls that are logged in

13   as the defendant, did he identify himself as anything on the

14   calls?

15   A.    Yes.

16   Q.    What did he identify himself as?

17   A.    As "Mario."

18   Q.    Was he calling anyone that you could associate with

19   the defendant, Mario Reynoso?

20   A.    Yes, he did.

21   Q.    Who?

22   A.    He placed calls to Nancy, which is his live-in -- I'm

23   not sure if it's his wife or girlfriend, Nancy.   He has made

24   calls to Priscilla, calls to Angie, and he has made calls to

25   Big Smokes.

144

1    Q.   And these are all people that were also indicated in

2    his phone records --

3    A.   Yes --

4    Q.   -- or the text messages?

5    A.   -- correct.

6    Q.   So I'm going to hand you what's been marked as

7    Government's Exhibits 39, 40, 41, and 44, along with

8    Exhibits 39(a), 40(a), 41(a), and 44(a), which are the

9    transcripts.

10              MS. CAMACHO:  If I might have just a moment to

11   consult with Defense Counsel, Your Honor?

12              THE COURT:  (Indicating.)

13                   (Discussion off the record.)

14              MR. CLARK:  Your Honor, I apologize.

15              Counsel?

16                   (Discussion off the record.)

17   Q.   (BY MS. CAMACHO):  Okay.  Sorry about the

18   confusion.  So I've handed you Exhibits 39, 40, 41,

19   and 44, along with their corresponding transcripts.

20              Agent, have you reviewed those records before

21   coming in to court today?

22   A.   Yes, I have.

23   Q.   And are those true and accurate copies of the jail

24   calls -- of some of the jail calls that you reviewed that

25   were made by the defendant from the Doña Ana County jail?

1    A.   Yes.

2    Q.   And have you reviewed the transcripts, as well?

3    A.   Yes, I have.

4    Q.   And you speak Spanish, as well, Agent?

5    A.   Yes, I do.

6    Q.   Are the transcripts true and accurate transcriptions

7    and, to the extent necessary, translations of those jail

8    calls?

9    A.   Yes, they are.

10             MS. CAMACHO:  Your Honor, at this time, I would

11   move for the admission of Government's Exhibits 39, 40, 41,

12   44, and 39(a), 40(a), 41(a), and 44(a).

13             MR. CLARK:  Your Honor, I have no objection,

14   subject to a limiting instruction in due course that the

15   transcripts, themselves, are not the evidence.  The tape is

16   the evidence, Judge.

17             MS. CAMACHO:  I think that that's not quite

18   correct, Your Honor, because some of them are in Spanish,

19   and so the transcripts are the evidence when they're in

20   Spanish because the jury doesn't understand the actual

21   recordings.

22             THE COURT:  We've admitted transcripts already as

23   evidence, as exhibits.  And we can talk about any limiting

24   instruction you think is necessary before we --

25             MR. CLARK:  In due course, Judge.  Thank you.

1          THE COURT:  Yes.  39, 39(a), 40, 40(a), 41?

2          MS. CAMACHO:  I'm sorry, yes, 39, 40, 41, and

3     then 44.

4          THE COURT:  Okay.  39 and 39(a), 40 and 40(a), 41

5     and 41(a), and 44 and 44(a) are admitted.

6     (Government's Exhibits 39, 39(a), 40, 40(a), 41, 41(a), 44,

7     and 44(a) were admitted into evidence.)

8     Q.   (BY MS. CAMACHO):  Agent, turning to -- and I'm

9     going to give you a notebook.  I'm going to hand you

10    a notebook that has them paginated so that they're

11    not just loose papers.

12    A.   That would work.  Thank you.

13    Q.   Turning to Exhibit Number 39, can you tell me at what

14    time that phone call and what date that phone call was made?

15    A.   That was made at 10:50 A.M.

16    Q.   On what day?

17    A.   On January's 31st, 2019.

18    Q.   So that's the day after the defendant's arrest?

19    A.   Correct.

20    Q.   And who were the participants?  You indicated -- I

21    think you just said her first name, but Nancy Ramirez is the

22    defendant's wife or live-in girlfriend?

23    A.   Yes.

24    Q.   So I think, for simplicity, we'll say "wife."

25    A.   Wife.

1    Q.   If you could play Exhibit 39, please.

2                    (Discussion off the record.)

3              So I apologize, yes, if I could pass out the

4    transcripts to the jury.  If we could have just a minute,

5    we'll actually pass all of them out, so we don't have to do

6    it in between each of them.

7                    (Discussion off the record.)

8              THE COURT:  In the meantime, we'll be collecting

9    the prior transcripts.

10             MS. CAMACHO:  They're paginated.  If they want,

11   they can put them in the notebooks; otherwise, they're going

12   to have a whole bunch of papers.

13             THE COURT:  Well, these are not the exhibits.

14   These are aids to help them follow along, right?  So you're

15   suggesting that they create their own exhibit book and take

16   it back with them?

17             MS. CAMACHO:  Could we approach?

18             THE COURT:  (Indicating.)

19                    (Bench conference.)

20             MS. CAMACHO:  So we've labeled these as aids just

21   because they correspond with the tapes, Your Honor, but I

22   believe all of their calls are at least partially in

23   Spanish, the ones that we played before and these ones, and

24   so I believe that the transcripts are substantive evidence

25   because the jury has no ability to -- well, some of them

```
 1    might, but they're supposed to rely on transcripts when
 2    they're a foreign language rather than the audio, itself.
 3    So I think the prior transcripts that we already admitted
 4    and these are of the same character.
 5              THE COURT:  I think they are of the same
 6    character, but I don't want the jury responsible for putting
 7    looseleaf exhibits, transcripts, into some larger book that
 8    they're going to have to deliberate.  That's not --
 9              MS. CAMACHO:  I'm sorry, Your Honor.  We didn't
10    put them in because they hadn't been admitted, so we
11    couldn't hand them to the jury.
12              THE COURT:  Why do they need to have them in
13    their hands, transcripts that were prior aids and prior
14    evidence, while they're looking at the new transcripts?
15              MS. CAMACHO:  They don't, particularly.  I just
16    thought the books were easiest, but if you would like, we
17    can staple the pages and just hand them individual
18    transcripts with each call.
19              MR. CLARK:  Absolutely your call.
20              MS. CAMACHO:  Or we can collect -- if you give
21    me --
22              THE COURT:  I'm glad for you to give them the
23    transcripts of the calls which you intend to talk about
24    right now.  I don't want them to just hold onto the
25    transcripts from earlier in the day because, at some point,
```

1    that has an undue influence on the jurors.  I mean, they're

2    going to continue to ponder those things out of the normal

3    course.  So I'd like to collect the books and hand out the

4    ones that you're about to talk about now.

5              MS. CAMACHO:  Okay.

6                   (Bench conference concluded.)

7              THE COURT:  So ladies and gentlemen, we're going

8    to collect those books from you.  And there's going to be

9    some additional handouts for you.

10                  (Discussion off the record.)

11             MS. CAMACHO:  Okay.  So sorry about that.  If we

12   can now play Exhibit 39.

13                  (Recording playing.)

14                  (Recording stopped.)

15   Q.  (BY MS. CAMACHO):  Agent, in this call, from

16   the day after the defendant's arrest, he says that

17   "they caught me with 7 ounces."  Is that the amount

18   of methamphetamine that he had on his person on the

19   date of his arrest, on January 30th, of 2019?

20   A.   Yes, it is.

21   Q.   I'm sorry.  I misspoke.  In his vehicle?

22   A.   Yes.

23   Q.   And you testified earlier that you also confiscated

24   the phone, as he put it?

25   A.   Yes.

1    Q.   On page 5 of the transcript, his wife is asking, a

2    little past halfway down the page (reading), "How much was

3    the two that you had in the car?"

4              To which the defendant replies, "What they took

5    from me?"

6              And his wife says, "No, the one that you left in

7    the car."  And then went on to say, "I found one in the

8    car."

9              Based on your training and experience, what is

10   being discussed there?

11   A.   Nancy, his wife, was discussing that she had found one

12   unit of unknown narcotic in the car.  Additional unit or

13   dosage.

14   Q.   Would that have been in the car that he was in on

15   January 30th or in a different vehicle?

16             MR. CLARK:  Objection, calls for speculation and

17   lack of foundation.

18             THE COURT:  Counsel?

19   Q.   (BY MS. CAMACHO):  Agent, was his vehicle

20   seized on January 30th when he was arrested?

21   A.   Yes, it was.

22   Q.   And there's a number of places in the call, primarily

23   towards the beginning where the defendant is saying

24   (reading), "Wonders owes me, like, 900; Susanna owes me 200;

25   Yvette owes me 600."  As a narcotics agent, what importance

1   does it have to you that type of comments when somebody has

2   first been arrested?

3   A.   Basically, in essence, what he's saying is he's

4   telling Nancy that there's money that's owed out there to

5   him by individuals that he had provided narcotics for.   So

6   the different amounts that he was talking about was in

7   reference to money that was owed to him from narcotics

8   sales.

9   Q.   And at one point, Ms. Ramirez says that she wants

10  somebody else to collect the money, that she doesn't want to

11  be in charge of it.   And the defendant replies that all the

12  money has to come through her.   Is that typical in narcotics

13  transactions or with narcotics traffickers that they want

14  the money to go to a trusted person?

15  A.   Yes, it is.

16  Q.   And finally, there's talk on and off throughout the

17  call about needing to talk to "The Uncle," and Mr. Reynoso

18  asking his wife to go talk to The Uncle, personally.   In

19  your experience, what is that code for in the narcotics

20  world?

21  A.   In the narcotics world, it's somebody who is supplying

22  him.   He's probably a higher echelon person.   That's --

23  basically, he's the one supplying Mario the narcotic.

24  Q.   You said "he."   The Uncle?

25  A.   The Uncle.

1    Q.    So in your opinion, would it be a biological uncle or

2    just a code word?

3    A.    That's a code word that narcotic traffickers use.

4              MS. CAMACHO:  Do you want me to go on to the next

5    transcript, Your Honor, or the next call?  It's about 15

6    minutes long?

7              THE COURT:  No, let's -- let's -- it's been a

8    long day, folks.  Let's wrap it up there.  We'll start with

9    the next call at 9:00 in the morning.

10             Please keep in mind my earlier admonitions:

11   Don't think or talk about the case yet.  You know, you've

12   heard some information, but -- and the reason for that,

13   that's not just me being arbitrary, I don't want you

14   thinking or talking about the case, thinking to yourself or

15   talking with anyone else about it because, when you do that,

16   the deliberative process starts.  I don't want you to

17   deliberate the case until you've heard all the evidence and

18   you've seen all the exhibits and you're back there together

19   as a group.

20             So relax, watch some TV.  Let's see, the World

21   Cup was yesterday, so I don't know what's on tonight, but

22   surely you can find something entertaining.  So please, too,

23   I don't think there's any press coverage, but avoid anything

24   in the paper or on the TV that might surprise us by being

25   there, okay?

1          Have a great evening.  We'll see you back here,

2     ready to go to work, at 9:00 in the morning.

3          MS. CAMACHO:  Your Honor, they're asking about

4     the transcripts.

5          THE COURT:  Please leave your transcripts there

6     and leave your notes in the jury room before you go home,

7     okay?

8          Thanks very much.

9               (Jury not present.)

10         You can take your seats, folks.

11         Is there anything else that we can cover this

12    evening, using these next ten minutes?

13         MS. CAMACHO:  I don't think so, Your Honor.

14         MR. CLARK:  Nothing from defense, Your Honor.

15    Thank you.

16         THE COURT:  Ms. Camacho, I wonder if the next

17    calls are going to be similar to that call?  That call had

18    several -- a minute or two worth of the information that you

19    were interested to get and the rest of it was a man and his

20    wife arguing and him being demeaning, and I wasn't sure we

21    needed to hear all 12 minutes of that.  I don't know if we

22    can be more focused on subsequent tapes or not.

23         MS. CAMACHO:  I could, Your Honor; however, it is

24    difficult because it's interspersed, the relevant

25    information is interspersed throughout the calls.  And at

 1   least on the last call, on Exhibit 44, I had actually

 2   offered to cut it down to avoid some of the nonrelevant, but

 3   just sort of talk, and the defendant -- that was what we

 4   were discussing with defense counsel, and the defendant

 5   wants us to play the whole call.  And so I think, if he

 6   wants the whole call in completeness --

 7                    (Discussion off the record.)

 8            THE COURT:  Listen, I didn't know about that

 9   conversation, of course, but this is the defense objection?

10            MR. CLARK:  Your Honor, I'm going to confer with

11   my client.  He really has mixed feelings about it.  I would

12   prefer we -- like the Government said, I think we can shave

13   a lot of time, a lot of irrelevant material, but my client's

14   very active in his defense, and rightly so.  I just need to

15   spend a little time with him tonight and hopefully we can

16   get a solid answer in the morning.  I hate to do that,

17   Counsel.

18            MS. CAMACHO:  So we've prepared Exhibit 44, that

19   way -- a shortened version.  We haven't the others.  It's

20   very difficult, without knowing which portions he would

21   want -- and it takes time to redact the audio and --

22            THE COURT:  Of course it does.  You guys talk

23   about it some tonight.  I'm afraid, though, if you alert her

24   at 9:00 in the morning to a preference, it's going to be

25   late in the game for that.

1          MR. CLARK:  We're going to make a hard decision

2    in five minutes, Judge.

3          THE COURT:  All right.  Thank you.

4          We'll see you-all at 9:00 in the morning, all

5    right?  Thanks very much.

6     (The proceedings adjourned at 4:56 P.M. and reconvened on

7               Tuesday, July 9, 2019, at 9:01 A.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        UNITED STATES OF AMERICA

2                         DISTRICT OF NEW MEXICO

3

4                    CERTIFICATE OF OFFICIAL REPORTER

5           I, Vanessa I. Alyce, CRR, RPR, NM CCR, and Federal

6   Official Court Reporter in and for the United States

7   District Court for the District of New Mexico, do hereby

8   certify that pursuant to Section 753, Title 28, United

9   States Code, that I did report in stenographic shorthand to

10  the best of my skill and ability the foregoing pages 1-155

11  of Volume I of II of the proceedings set forth herein, that

12  the foregoing is a true and correct transcript of the

13  stenographically recorded proceedings held in the

14  above-entitled matter and that the transcript page format is

15  in conformance with the regulations of the Judicial

16  Conference of the United States.

17

18  Dated this 27th day of October 2020.

19

20  S/Electronically Filed_____
    Vanessa I. Alyce, CRR, RPR, NM CCR #259
21  Federal Official Court Reporter
    100 North Church Street
22  Las Cruces, NM 88001
    Phone: (575) 528-1430
23  Email:  Vanessa_Alyce@nmd.uscourts.gov

24

25
```